Merrimack County Probate Court
No. 83-529

*In re* TRICIA AND TRIXIE H.

April 19, 1985

*S. David Siff*, of Concord, by brief and orally, for the parents of Tricia and Trixie H.

*Sulloway, Hollis & Soden*, of Concord (*Peter F. Imse* on the brief and orally), as guardian ad litem for Tricia and Trixie H.

*Gregory H. Smith*, attorney general (*Peter J. Minkow*, attorney, on the brief and orally), for the State.

SOUTER, J. The parents of two minor children appeal under RSA 567-A:1 (Supp. 1983) from a decree of the Merrimack County Probate Court (*Cushing*, J.), terminating their parental rights under RSA 170-C:5, III (Supp. 1983). The father claims that the probate court lacked jurisdiction to terminate his rights, because he was not the named respondent in a related neglect proceeding under RSA chapter 169-C (Supp. 1983). Both parents claim that the court applied erroneous standards for determining that the conditions for termination had been satisfied. We affirm.

The appellants are the natural parents of nine children. During the family's earlier residence in Vermont, the courts of that State terminated the appellants' parental rights over six of the children

on grounds of neglect and released the children for adoption. One child, born in 1983, remains with the appellants; the other two are the subjects of this appeal.

When these two children were infants, they too were placed in the custody of the State of Vermont following an adjudication of neglect. The record indicates that the children had been kept in filthy surroundings contaminated by animal feces and other noxious debris. In January 1979, their mother wished to move to Concord, New Hampshire, where their father was incarcerated at the New Hampshire Hospital, following conviction of aggravated felonious sexual assault on a minor. Tricia and Trixie were then, respectively, ten months and two and one-half years old. Vermont authorities released the children to the mother's custody, subject to requirements that she obtain suitable housing in Concord and allow periodic inspections by Vermont or New Hampshire authorities.

Soon after the mother and children moved to New Hampshire, an officer of the Concord Police Department filed a petition in the Concord District Court charging the mother with neglect under RSA 169:3 (now RSA 169-C:7 (Supp. 1983)). Although the father was not named as a respondent, the record indicates that he had actual notice of the charges. After his release from the hospital he actually appeared by counsel in later stages of the case.

On February 5, 1979, the district court awarded temporary custody to the New Hampshire Division of Welfare, which has provided foster care for the children ever since. At later proceedings, the State offered evidence that the mother and children had been living in an automobile and in the State Hospital's tunnels, which were dirty and infested with vermin. One child had bronchitis at the time the petitions were filed.

At the dispositional hearing under RSA 169:9 (now RSA 169-C:19 (Supp. 1983)), held on May 21, 1979, the district court found that the children were neglected. It accepted the division's recommendation that the mother should have visitation rights while the children remained in foster care. The division also recommended that the mother receive counselling on how to be an effective parent, that she obtain decent housing, and that the court seek the release of hospital reports on the father's treatment.

The record is replete with evidence that for some four years thereafter the division, at the court's behest, made repeated efforts to foster conditions under which the children could be returned to their parents. The record is equally clear that the mother, and later the father, failed or refused to make efforts sufficient to correct the conditions that had led to the finding of neglect. The mother obtained no counselling, she often failed or refused even to meet

with case workers, and she occasionally threatened to kill them. Following the father's release, he made no significant efforts to provide for the children.

A brief chronological review of the record bears out these conclusions. At a hearing in February 1980, the district court recommended that the mother obtain counselling and work with the division to provide for the children's care. Despite little progress, in May 1980 the division and the mother jointly submitted a case plan under RSA 169-C:21, II (Supp. 1983). The plan called for the submission of a full report on the father's psychiatric condition and a psychological evaluation of the mother. Under the plan she was obligated to obtain employment, so that she could contribute something for the support of the children, and to obtain a suitable place for the children to live.

Six months later, in November 1980, the district court ordered that the children remain in foster care, after considering reports from the division of welfare and the guardian ad litem that neither parent had complied fully with the case plan. Evidence indicated that the father had failed to authorize the release of hospital reports on his condition. Although the mother had obtained a job and housing, she had been unable or unwilling to cooperate with the psychiatrist who had attempted to make a psychological evaluation of her condition. The children's guardian ad litem held the opinion that the roots of the mother's problems as a parent and homemaker were yet to be addressed. In response, the district court again ordered a psychological evaluation of the mother. Although the court also authorized the mother's visitation with the children outside the foster home, two months later it revoked that order for outside visitation after finding that the mother had acted irresponsibly in exercising her visitation privilege, had refused to have the evaluation, and had refused to cooperate with the counsel whom the court had appointed for her.

In July 1981, the hospital released the father. He rejected his parole officer's recommendation to communicate with the division of welfare about his children and made no response to the division's own efforts to meet with him. It was not until May of 1982, and after repeated requests, that he signed a release authorizing the hospital to share his records with the district court.

By October 1981, the district court found that "exhaustive efforts [had] been made by all parties to reunite this family unit, but in every instance those efforts [had] been frustrated and refused by the parents . . . ." The court recommended that the division seek termination of parental rights in the probate court. The division did not

do so immediately, however, and on November 9, 1981, the father formally appeared, through counsel, in the district court proceedings.

For another year, conditions remained largely unchanged. It appears that during this period the parents failed to maintain living quarters that would have been appropriate for the children. The father's parole officer later testified that he had found the dwelling messy and malodorous.

It was not until December, 1982, that the parents met with a psychiatrist, two years after the first appointment had been made for them. Although they met with the psychiatrist three more times, the doctor concluded that the parents had made the visits merely to create a favorable impression at a later court appearance. Both parents were offered treatment for psychological problems affecting their ability to care for the children, but both refused it.

Finally, in March 1983, the district court again reviewed the case and concluded that the parents had frustrated the substantial efforts that the court and the division had made to reunite the family. For a second time, the district court recommended a termination of parental rights. On August 22, 1983, the division filed the present petition in the Merrimack County Probate Court, which granted the petition on December 1, 1983. The appellants claim that the probate court's order is tainted by error.

The first such error is claimed by the father alone, who rests his argument on the terms of RSA 170-C:5, III (Supp. 1983). He notes that he was not named as a respondent in the 1979 petition that led to the district court's finding of neglect under RSA 169-C:18 (Supp. 1983). He maintains that since he was not a party to the district court proceeding in which the neglect was originally found to exist, he may not be charged with a failure to correct the conditions of neglect. Therefore, he argues, the probate court had no basis to terminate his parental rights under RSA 170-C:5, III (Supp. 1983). He suggests that the termination order offends standards of due process.

█ His argument rests on a wholly erroneous reading of subsection III. That subsection does not provide that a parent must have been the named respondent in an RSA chapter 169-C neglect proceeding before that parent's rights can be terminated. It requires rather that the parent in question have "failed to correct the conditions leading to such a finding within 18 months of the finding," despite the district court's efforts to rectify conditions.

█ In this case the conditions that led to the finding of neglect were, in the final analysis, the unwillingness or inability of the parents to provide living conditions of minimal decency for the chil-

dren. The present record contains ample evidence of the father's failure to correct these conditions. He actually knew of the neglect proceedings, became a party to them upon his release from New Hampshire Hospital, rebuffed the efforts of the welfare division to involve him in ameliorating the conditions of neglect, and refused treatment offered to help him to become a responsible parent. His failure continued far beyond the eighteen months required by the statute, right up to the time of the probate court's decree. The evidence is more than sufficient to satisfy the statutory standards, and it provides no colorable basis to raise any issue of due process. The probate court was warranted in terminating the father's rights.

The second assignment of error is raised on behalf of the mother alone. She asserts that the district court should not have required her to obtain counselling in "parenting skills." She therefore argues that the probate court should not have considered her failure to receive such counselling when it determined that her parental rights should be terminated.

This argument fails to raise any substantial issue. The probate court did not terminate the mother's parental rights simply because she had failed to comply with a specific district court order. Rather, it is apparent that the probate court treated compliance or noncompliance with such orders merely as evidence bearing on the broader issue, whether the parents had failed to address their own conditions of ignorance and indifference to the children's welfare that had led originally to the findings of neglect. Hence, any argument about whether the district court should have required counselling in "parenting skills" misses the point. The issue before the probate court was whether the parents had failed to remedy conditions of neglect, and it is obvious that the probate court addressed just this issue.

The remaining assignments of error are raised on behalf of both parents. Their first joint claim is that the evidence was insufficient to support several of the probate court's specific findings beyond a reasonable doubt. *See State v. Robert H.* _____ , 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978). They challenge both the court's conclusion that the "record is one of non-cooperation" by the parents "with the Division of Welfare and the Court to rectify the conditions" and its conclusion that the parents made no "meaningful effort to reunite" the family.

From the statement of facts in this opinion, it should be obvious that the probate court was warranted beyond a reasonable doubt in coming to these conclusions. While the mother did obtain a job and some housing, there was evidence that the housing was dirty

and malodorous. Although the mother visited the children, there was evidence that she refused even to consider her own inadequacies that had resulted in the conditions of neglect, and there was evidence that neither parent made any plausible attempt to take advantage of the counselling and therapy available to them. While one might argue with the phrasing of the probate court's conclusion that the parents had been "content to allow the Division of Welfare to keep these two children in foster care for a period of four years," the fact remains that the parents were continually unwilling to respond to most of the district court's promptings. There was clear evidentiary support for the court's ultimate conclusions that the parents had failed for at least eighteen months to correct the conditions of neglect, despite the court's efforts.

The appellants press one further assignment of error. They argue that the court failed to make a crucial finding that must be made before parental rights can be terminated for failure to remedy conditions of neglect: a finding that the neglect has resulted in specific harm to the children. As authority they cite *State v. Robert H.* _____ *supra*, a case brought under RSA 170-C:5, III, as amended by Laws 1975, 280:5. There we held that "absent a showing of specific harm to the children, 'growing up in a so-called disadvantaged home is not a sufficient basis for coercive intervention'" in the form of termination of parental rights. *Id.* at 719, 393 A.2d at 1391 (citation omitted).

It is true that in this case the probate court made no finding expressed in terms of "specific harm." Nevertheless, for two reasons we find no error. First, the conditions of filth proven by the evidence in this case exceed anything that could be called merely a "disadvantaged home," and would satisfy the *Robert H.* standard.

Second, and more important for the future, *Robert H.* is no longer to be taken as authority in applying subsection III, for that subsection has been amended since *Robert H.* was decided. In 1978, subsection III did not require proof that the parents' failure to correct the conditions of neglect had persisted for at least eighteen months. Since a failure of any duration was then theoretically a possible basis for terminating parental rights, we required a showing of specific harm to preclude the possibility of infringing constitutionally protected liberty interests on proof of a merely *de minimis* failure to take corrective action. *See id. Cf. In re Doe*, 123 N.H. 634, 465 A.2d 925 (1953); *In re Brenda H.*, 119 N.H. 382, 402 A.2d 169 (1979).

■ In 1983, however, the legislature amended subsection III to require proof that the parents' failure to correct conditions had persisted for at least eighteen months. There is, therefore, no longer any

danger that a failure to accomplish much in a very short time could lead to the termination of a fundamental parental right. Hence we conclude that due process does not require proof of "specific harm" over and above the necessary findings that the parents have failed for as long as eighteen months to rectify the conditions of neglect, despite the court's attempts to promote their correction.

We find no merit in the appellants' claims of error, and the judgment of the probate court is therefore affirmed.

*Affirmed.*

All concurred.