Cheshire County Probate Court
No. 2001-461

## In re Jonathan T. & a.

Argued: June 12, 2002
Opinion Issued: September 16, 2002

*Rab & Neiman, P.A.*, of Keene (*Gerald D. Neiman* on the brief and orally), for respondent Bethany L.

*Lane & Bentley, P.C.*, of Keene (*Michael P. Bentley* on the brief and orally), for respondent Troy L., Sr.

*Philip T. McLaughlin*, attorney general (*Ann F. Larney*, associate attorney general, on the brief, and *Karen Schlitzer*, attorney, orally), for the State.

DUGGAN, J. The respondents, Bethany L. and Troy L., Sr., appeal an order of the Cheshire County Probate Court (*Patten*, J.) terminating the parental rights of Bethany L. over her sons, Jonathan T., Troy L., Jr., and Caleb L., and the parental rights of Troy L., Sr. over his son, Caleb L., pursuant to RSA 170-C:5, III (2002). The respondents argue that the probate court erred in: (1) admitting reports into evidence without requiring the persons generating the reports to be present and available at the termination hearing; (2) failing to consider the respondents' cognitive and financial limitations in assessing the reasonableness of the State's efforts to assist them and in terminating the respondents' parental rights; and (3) allowing expert testimony despite non-compliance with Superior Court Rule 63(G). We affirm.

The record supports the following facts. On February 4, 1997, the Jaffrey-Peterborough District Court (*Runyon*, J.) entered an adjudicatory order ruling that Jonathan T., Troy L., Jr., and Caleb L. (the children) were neglected children under RSA 169-C:3, XIX(b) (2002). The order included a consent agreement, signed by the respondents and representatives of the State, acknowledging the neglect and enumerating various guidelines designed to correct the conditions of neglect. As part of the consent agreement, the division for children, youth and families (DCYF) was granted legal supervision of the children.

DCYF then provided counseling services to the family through Familystrength, a local service agency. Although these services were initially successful, the respondents' progress in correcting the conditions of neglect began to decline. As a result, at the first review hearing on August 5, 1997, the district court accepted DCYF's recommendation that the family be referred from Familystrength, a short-term service provider, to Monadnock Family Services (MFS), a long-term service provider.

Over the next two and one-half years, the district court held review hearings at approximately six-month intervals. Although the reports offered at these hearings indicated some progress, they also indicated that, without direct involvement and prompting (*e.g.*, from DCYF or MFS), the respondents were unable and unwilling to follow through in their efforts to cure the neglect. As a result, at the hearing on October 27, 1998, the court ordered that the children be placed in foster care, but maintained a variety of services to help the family.

Subsequent reports showed largely positive results for the children in foster care, but also showed the respondents' continuing inability and refusal to correct the conditions constituting neglect. Thus, three years after the finding of neglect, the district court ruled on February 29, 2000, that any further efforts to correct the conditions of neglect and to reunify the family would be futile and detrimental to the children's needs. The court ordered DCYF to cease reunification efforts and proceed with a termination of the respondents' parental rights in the probate court.

The termination hearing in the probate court took place over five days in March and June of 2001. The probate court found beyond a reasonable doubt that the respondents had failed and refused to correct the conditions constituting neglect within eighteen months of the initial finding of neglect. The court ruled that termination of the respondents' parental rights was in the children's best interests, and granted the petition for termination pursuant to RSA 170-C:5, III.

The respondents first argue that the probate court violated RSA 170-C:10 and Rule 804 of the New Hampshire Rules of Evidence by admitting reports and other documents into evidence without requiring the State to either (1) make the persons generating the reports available for direct and cross-examination, or (2) demonstrate that these persons were unavailable to testify. The respondents also claim that the court's ruling violated their due process and confrontation rights under Part I, Article 15 of the New Hampshire Constitution.

We first address the respondents' statutory arguments. We have previously determined that RSA 170-C:10 requires the testimony of the person originally making a report, if that person is reasonably available. *In re Kristopher B.*, 125 N.H. 678, 683 (1984).

The record below indicates that, over the respondents' objections, the probate judge permitted the State on thirteen occasions to enter documents as exhibits through the testimony of witnesses who had not originally prepared them. These documents included letters by a child and family therapist and a social worker reporting on the family's recent progress (exhibits 12 and 15), a letter from the MFS management team discussing MFS's recommendations on foster care (exhibit 16), referral

notes and a letter from the manager of the family's housing complex concerning the unsanitary conditions in the home (exhibit 18), a report from the children's case manager summarizing the MFS services provided to date (exhibit 20), four reports prepared by CASA workers (exhibits 19, 23, 27 and 30), attachments to three progress reports prepared by a DCYF child protective service worker (exhibits 22, 29 and 33), and an evaluation by a nutritionist (exhibit 35).

The State later called as witnesses two people who had prepared exhibits 12, 29 and 33, as well as portions of exhibits 16 and 22. Also, for exhibit 19, the State informed the court that the author was unavailable as a witness due to illness. The court ruled that the author was not reasonably available under RSA 170-C:10. With those exceptions, nothing in the record indicates whether or not the people who prepared the admitted documents were residing or working in the State or were otherwise reasonably available.

The probate judge overruled each of the respondents' objections concerning the exhibits. On appeal, the respondents argue that the judge's admission of these exhibits was error under RSA 170-C:10.

RSA 170-C:10 provides that, in a termination hearing:

> [R]elevant and material information of any nature, including that contained in reports, studies or examinations, may be admitted and relied upon to the extent of its probative value. When information contained in a report, study or examination is admitted in evidence, *the person making such a report, study or examination shall be subject to both direct and cross-examination if he is residing or working within the state, or if he is otherwise reasonably available.*

(Emphasis added.) We have addressed the admission of reports under RSA 170-C:10 in two previous termination cases. In *Kristopher B.*, the probate court admitted records of the defendant's treatment history for mental illness without testimony from the authors of the reports. *In re Kristopher B.*, 125 N.H. at 683. Nothing in the record indicated whether or not the authors were residing or working in the State or were otherwise reasonably available. *Id.* We held that the admission of the records was error. *Id.* at 684. In so holding, we stated that given the "fundamental right of parents to maintain relationships with their children," we insist upon compliance with the evidentiary requirements set forth in RSA 170-C:10. *Id.* at 683. Evidence forming the basis for termination of parental rights may be admitted "only when it complies with statutory safeguards." *Id.*

In *Antonio W.*, the probate court admitted written reports of a parent aide without requiring the State to produce the aide as a witness. *In re*

*Antonio W.*, 147 N.H. 408, 413 (2002). Unlike *Kristopher B.*, however, the State informed the court that the parent aide resided in Massachusetts and was unavailable to testify. *Id.* On appeal, we held that the probate court complied with the requirements of RSA 170-C:10 concerning admission of evidence because the State demonstrated the unavailability of the witness. *Id.*

█ Consistent with *Antonio W.*, we hold that the probate judge properly admitted exhibit 19 under RSA 170-C:10 because the State adequately demonstrated the unavailability of the author. We also hold that the probate court complied with RSA 170-C:10 in admitting documents prepared by witnesses who testified later in the hearing, which include exhibits 12, 29, 33, and portions of 16 and 22. *See In re Kristopher B.*, 125 N.H. at 683. However, with respect to exhibits 15, 18, 20, 23, 27, 30, 35, and the portions of 16 and 22 that were not prepared by witnesses who testified at the hearing, the record does not support their admissibility under RSA 170-C:10.

We next consider whether the probate court's error requires reversal. *Cf. State v. Dellorfano*, 128 N.H. 628, 634 (1986). "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment will not be disturbed." *In re Tracy M.*, 137 N.H. 119, 125-26 (1993) (quotation omitted).

The appealing party has the burden of presenting a record sufficient to allow the court to decide the issues presented on appeal. *See Rix v. Kinderworks Corp.*, 136 N.H. 548, 553 (1992); *see also* SUP. CT. R. 13(3). Because the respondents did not provide us with the erroneously admitted exhibits, we cannot decide whether the error was harmful to their case.

█ It nonetheless appears from the hearing testimony that the evidence provided by these exhibits was largely cumulative. At the five-day hearing, the State offered the testimony of six witnesses, including two child protective service workers, a child and family therapist, a parent aide coordinator, a clinical psychologist, and a case manager, each of whom had been involved with the family following the finding of neglect. This testimony clearly and consistently reveals an on-going pattern of unsanitary and unsafe conditions in the home, inadequate supervision of the children by the respondents, persistent refusal by the respondents to make recommended changes and cooperate with support personnel, and failure to establish routines and structure for the children. From what we can glean from the record, the inadmissible exhibits were cumulative of this testimony and thus any error was harmless.

The respondents also argue that (1) exhibits 18, 19, 22 and 27 are inadmissible under Rule 804 of the New Hampshire Rules of Evidence, and (2) exhibit 27 is inadmissible under Part I, Article 15 of the New Hampshire Constitution. We need not address their arguments pertaining to exhibits 18, 27 and the portions of exhibit 22 that were not prepared by witnesses who testified at the hearing because we have already concluded that these exhibits are inadmissible under RSA 170-C:10 but their admission does not require reversal. Moreover, we conclude that the admission of exhibit 19 and the remainder of exhibit 22 does not constitute reversible error.

The respondents next argue that the probate court erred in finding that the State's efforts to assist them were reasonable in light of the respondents' cognitive and financial limitations. The respondents also argue that the court failed to consider these limitations in deciding to terminate their parental rights.

Under RSA 169-C:24-a, III(c) (2002), the State may not be required to file a petition for termination of parental rights if it has not provided the family with "such services and reasonable efforts as the State deems necessary for the safe return of the child to the child's home." In assessing the State's efforts, the district court must consider whether the services provided have been accessible, available and appropriate. RSA 169-C:24-a, III(c). In a case of neglect, the probate court may grant the petition if it finds that the parents have failed to correct the conditions of neglect despite reasonable efforts under the direction of the district court to rectify the conditions. RSA 170-C:5, III.

The respondents' argument relies upon *Robert H.*, where we stated that, before filing a petition for termination, the State must make "every effort" and must "[work] with the parents" to help them provide a family for their children. *See State v. Robert H.*, 118 N.H. 713, 719 (1978) (quotation omitted). However, we have recently held that the State need only make "reasonable efforts," as expressly required by RSA 170-C:5, III. *See In re Craig T.*, 147 N.H. 739, 745, (2002) (overruling *Robert H.* to extent it required that the "every effort" standard be applied by probate court). Moreover, as the respondents acknowledge in their brief, the State's ability to provide adequate services is constrained by its staff and dollar limitations. *See In re Diana P.*, 120 N.H. 791, 798 (1980), *overruled on other grounds by In re Craig T.*, 147 N.H. at 744-45. In short, therefore, the State must put forth reasonable efforts given its available staff and financial resources to maintain the legal bond between parent and child. *See id.; see also In re Angel N.*, 141 N.H. 158, 164 (1996); *In re Kristopher B.*, 125 N.H. at 682-83.

The probate court's findings of fact are final "unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (1997). "Consequently, we will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re Angel N.*, 141 N.H. at 161 (brackets and quotation omitted).

■ The record indicates that the State has made reasonable efforts to work with the respondents and to facilitate reunification of the family. *See In re Lisa H.*, 134 N.H. 188, 194 (1991). Under the district court's direction, DCYF provided a multitude of home-based, school-based and outpatient services to the family, including parent aide services, preschool and day care, parenting and stress management classes, therapy and counseling, supervised visitations, financial management assistance and nutritional guidance. In some cases, these services exceeded the normal protocol. For example, at one point the parent aide was visiting the family's home every day, well above the one-visit-per-month guideline typically followed by DCYF. DCYF also made additional efforts by holding pre-visitation meetings with the respondents to discuss the previous visitation as well as concerns, suggestions and planning issues. As one of the State's witnesses testified at the termination hearing, "We could not have provided more. We provided the full array of services in the community in the home [*sic*] that was available."

The respondents argue that the State's efforts were not reasonable because DCYF replaced Familystrength with MFS as the in-home service provider. They argue that the family made progress under Familystrength but then continually went downhill under MFS. They also argue that DCYF should have reinstituted the Familystrength services given the decline in progress.

We disagree that the transition from Familystrength to MFS was unreasonable. The record clearly indicates that Familystrength is only a short-term, crisis-oriented service provider, and that such transitions are common. Although the typical term for Familystrength is three months, the respondents received extended services lasting approximately five months. During this period, the staff of Familystrength determined that a transition to MFS would be most beneficial for the family. DCYF, the children's guardian ad litem (CASA), and the district court all agreed. MFS provides broader, more comprehensive services than Familystrength and, unlike Familystrength, could continue providing long-term services to the family even after the case was closed. In addition, neither the respondents nor their counsel ever asked the district court specifically to have Familystrength reinstated. Finally, although the respondents' argument relies heavily upon the progress shown by Familystrength

reports, the record contains uncontroverted testimony from two witnesses that Familystrength typically emphasizes only positive results, as a method of encouraging families to maintain their efforts.

The respondents also argue that the State's efforts were not reasonable because they did not adequately account for the respondents' cognitive and financial limitations, which the respondents contend prevented them from correcting the conditions of neglect. Specifically, they argue that the State failed to evaluate them and determine the extent of their limitations. Although the State never conducted a psychological evaluation of respondent Troy L., Sr., the record includes the testimony of Dr. Carey Bluhm, a clinical psychologist who evaluated Troy L., Sr. and found that he has serious intellectual limitations, a high level of stress, and a tendency towards non-compliance. The State conducted limited evaluations of respondent Bethany L., which indicated that she had below-average intellectual abilities and might have difficulty coping with the stresses of parenting. The record also indicates that, although the respondents were financially troubled, Bethany L. was employed, and Troy L., Sr. had received a $20,000 workers' compensation award and continued to receive periodic disability payments.

Nothing in the record demonstrates that the respondents' cognitive and financial limitations, as well as Troy L., Sr.'s physical disability, rendered them incapable of performing basic parenting skills and maintaining a safe, sanitary household for the children. On the contrary, the record indicates that, despite their limitations, the respondents were capable of doing what the service providers recommended. The record further indicates that DCYF considered the respondents' limitations in making decisions, providing recommendations, setting goals and developing plans for helping with the reunification. For example, the parent aides often prepared simple checklists to help the family develop routines for meals, personal hygiene, house cleaning and other necessities. They also took steps to make sure the respondents understood the checklists, such as modeling the recommended activities. In short, the State's approach was not "one size fits all," as the respondents argue.

More importantly, the record includes overwhelming evidence that the key barrier to the respondents' improvement was their perpetual unwillingness to cooperate with the service providers and follow through with their recommendations and instructions. This issue is not new to this court. In *Tricia H.*, we upheld the termination of parental rights in a situation where the finding of neglect was based upon the parents' unwillingness and inability to provide minimally decent living conditions for their children. *In re Tricia H.*, 126 N.H. 418, 422-23 (1985). We also upheld the termination of parental rights in *Lisa H.*, where we observed

that "the respondent's apathy toward maintaining her parental rights limited what [the State] could have accomplished." *In re Lisa H.*, 134 N.H. at 194.

■ Finally, the respondents contend that the probate judge did not consider their cognitive and financial limitations in deciding to terminate their parental rights. Their claim is based primarily upon the fact that the judge did not mention these limitations in his order. The judge's failure to discuss the respondents' limitations in the order does not imply that he did not consider them. On the contrary, "in the absence of specific findings, a court is presumed to have made all findings necessary to support its decree." *In re Lisa H.*, 134 N.H. at 195 (quotation omitted). Moreover, the respondents did not request any findings of fact or rulings of law by the court. As a result, the judge was not required to expressly address the respondents' limitations in the order. *See* RSA 567-A:4 (1997).

The respondents' final argument is that the probate court erred by allowing expert testimony by two witnesses despite non-compliance with Superior Court Rule 63(G). We disagree.

On March 29, the second day of the termination hearing, the State offered the testimony of Dr. Diana Sholtz, a clinical psychologist whom the court qualified as an expert in child psychology. On cross-examination, counsel for the respondents asked whether Dr. Sholtz had brought her entire file on the case to the hearing. Dr. Sholtz had not brought her file, nor had she been instructed to do so by counsel for DCYF.

The respondents moved to strike Dr. Sholtz's testimony on the grounds that DCYF's failure to instruct her to bring her file was a violation of Superior Court Rule 63(G). In response, the probate judge instructed counsel for the respondents to continue with the cross-examination to the extent possible, and indicated that Dr. Sholtz would be subject to recall for further cross-examination after her file was provided to counsel. Counsel agreed to this resolution.

At the close of the State's case approximately three months later, the respondents moved to strike Dr. Sholtz's testimony because the State failed to recall her as a witness. The judge denied the motion, but agreed to provide counsel for the respondents time to review Dr. Sholtz's file and to conduct additional cross-examination at a later date, if necessary. Counsel for the respondents received the file on June 28, the fifth day of the hearing, and reviewed it over the lunch recess. After reviewing the file, they informed the court that:

> [I]t would [have been] helpful to have had this material ... during direct and cross-examination, but given where we are in the case at this point in time, ... we don't feel there's a great

deal to be gained bringing her back . . . . [T]here's a lot more water over the dam than where we were back on March 29th.

Although the court considered Superior Court Rule 63(G) as being applicable in this case, the respondents' brief correctly points out that the appropriate rule was former Probate Court Rule 13(1), which was substantially identical to Superior Court Rule 63(G), and provided: "All experts, who are to testify at hearing, will be advised by the litigant or counsel for the litigant calling such witness to bring their original records and notes to the hearing." PROB. CT. R. 13(1) (repealed 2001).

■ By not instructing Dr. Sholtz to bring her file, the State failed to comply with former Probate Court Rule 13(1). Based upon the statements by their counsel, however, we find that the respondents acquiesced to the court's ruling regarding Dr. Sholtz's expert testimony. Therefore, we hold that the respondents have waived any further consideration of this issue. *See Arnold v. City of Manchester*, 119 N.H. 859, 864 (1979).

The respondents also argue that the probate court erred in allowing the testimony of Maureen LaFortune, a licensed child and family therapist with MFS who holds a master's degree in social work. On cross-examination, counsel for the respondents asked whether Ms. LaFortune had brought her entire file on the case to the hearing. Like Dr. Sholtz, Ms. LaFortune had not brought her file, nor had she been instructed to do so by counsel for DCYF.

The respondents moved to strike Ms. LaFortune's testimony due to non-compliance with Superior Court Rule 63(G). The judge denied the motion on the grounds that Ms. LaFortune was neither offered nor qualified as an expert witness. The judge also indicated that he would accept Ms. LaFortune's testimony for its factual information but not as expert opinion.

■ Because Ms. LaFortune was not offered as an expert witness and because the court considered only her factual testimony, we hold that the requirements of former Probate Court Rule 13(1) do not apply. As a result, counsel for DCYF was not required to instruct Ms. LaFortune to bring her file to the hearing.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.