Sullivan County Probate Court
No. 2003-195

IN RE JUVENILE 2003-195

Argued: January 14, 2004
Opinion Issued: March 12, 2004

*Peter W. Heed*, attorney general (*Mary P. Castelli*, senior assistant attorney general, on the brief and orally), for the State.

*Buckley and Zopf*, of Claremont (*Anthony F. DiPadova, Jr.* on the brief and orally), for the respondent.

NADEAU, J. The respondent appeals an order of the Sullivan County Probate Court (*Feeney*, J.) terminating his parental rights over his son, the juvenile in this case, pursuant to RSA 170-C:5, III (2002). We affirm.

The record supports the following facts. In 1998, the respondent was convicted of unlawful contact with a female minor and given a probationary sentence. In July 2000, he violated his probation by engaging in unlawful sexual contact with another female minor. As a result, he was incarcerated in the Maine Correctional Facility to serve the balance of a three-year sentence. On October 12, 2000, while the respondent was incarcerated, his son was born.

Shortly thereafter, the New Hampshire Division for Children, Youth, and Families (DCYF) filed a petition for neglect against the respondent

that was later withdrawn. The respondent, however, signed a consent decree, which required him to "undergo a psychological evaluation and . . . follow any recommendations resulting there from," and to "follow all treatment requirements relevant to his incarceration in the Maine Correctional Facility."

In February 2001, the respondent obtained a transfer from the Maine Correctional Facility to the New Hampshire State Prison (State Prison) to facilitate visitation with his son. In April 2001, the State Prison evaluated the respondent and recommended that he participate in an intense sexual offender program lasting between twelve and sixteen months. Entry into the program required admission of prior offenses or alternatively, submission to a polygraph test. To avoid making an admission or submitting to a polygraph, he applied to a less intensive program. The State Prison denied him admission, however, because the program was not appropriate for an inmate with his sexual offender history. Because the respondent continued to deny committing the second sexual offense that led to his probation violation, the State Prison scheduled a polygraph for admission to the intensive program in June 2001. The respondent, however, refused to take the polygraph and thus was ineligible for the program.

On June 21, 2001, the Newport District Court ordered that a psychological evaluation of the respondent should be conducted and submitted to the court. The court also ordered that the respondent have one supervised visit per month with his son. In August 2001, Dr. Wayment conducted a psychological evaluation of the respondent. She found he had a significant history of sexual offending, and recommended he undergo a psychosexual evaluation, which the district court ordered. The court also ordered continuation of his supervised monthly visitation with his son.

A few months later, Dr. Vanaskie conducted a psychosexual evaluation of the respondent. Dr. Vanaskie recommended that reunification be delayed until the respondent successfully completed an intensive offense-specific treatment for his sexual behavior. Dr. Vanaskie classified him as posing a moderate to high risk of reoffending during the treatment process.

In January 2002, the district court conducted a permanency hearing and discontinued visitation pending the outcome of a parenting evaluation. The court ordered the respondent to follow all recommendations of the psychosexual and parenting evaluations. After the hearing, the respondent wrote a letter to the State Prison requesting confirmation that he did not have enough time remaining on his sentence to complete the prison sexual offender program. The director of the sexual offender program responded,

however, that had he taken the polygraph scheduled by the prison, he "would have had plenty of time to do it" before his earliest possible release date.

In April 2002, the district court reiterated its previous order and adopted DCYF"s recommendations ordering the respondent to follow all recommendations resulting from the psychosexual evaluation by Dr. Vanaskie. Specifically, the order provided that he "shall participate meaningfully and complete a sexual offender's treatment program, he shall participate and complete appropriate parenting classes and he shall participate in substance abuse counseling." The court also reinstated supervised monthly visitation with his son.

In October 2002, the district court conducted a review hearing. The court found that the respondent failed to complete or participate in the sexual offender treatment program even though it was offered at the State Prison, failed to undergo a parenting evaluation and a substance abuse evaluation, which were available at the prison, and would not start addressing his issues in treatment until his scheduled release in June 2003. The juvenile would be three years old upon the respondent's scheduled release, and would likely be four or five by the time the respondent completed a sexual offender program outside prison. The court found this delay to be unacceptable, and inconsistent with the goal of permanency for the juvenile. It ordered cessation of reunification efforts, but permitted the respondent to have supervised visitation at the discretion of DCYF and in consultation with the guardian ad litem.

In November 2002, DCYF filed a petition to terminate the parental rights of the respondent, alleging failure to correct conditions of neglect or abuse under RSA chapter 169-C relating to the consent agreement. In February 2003, the probate court held a parental termination hearing. MaryAnn Babic-Keith, a DCYF supervisor, testified at the hearing. She explained that she supervises the caseworkers, regularly discussed the respondent's case with both caseworkers, and reviewed their reports prior to submission to the court. She testified that Todd Basler, a caseworker for the juvenile, stopped working for DCYF and moved to California. She also testified that Roberta Bell, another caseworker for the juvenile, stopped working at DCYF, sold her house, and moved out of state, possibly to New York.

The respondent also testified at the hearing. In response to questions concerning his failure to participate in a prison sexual offender program, he testified that the program had not yet been recommended by Dr. Vanaskie at the time the prison evaluated him for it, he wanted to resume treatment with a former counselor in Maine, and he thought participation

in the program might extend his prison release date. Dr. Vanaskie also testified, stating that the respondent posed a moderate to high risk of reoffending, and that until he completed a sexual offender program, reunification with his child would be impossible because his ability to parent could not be properly assessed.

The probate court found Dr. Vanaskie's testimony compelling. It also found the respondent had had the ability to complete the sexual offender counseling and treatment while in prison, but failed to do so. The court found that he was given an opportunity to demonstrate he is capable of caring for his child, but failed to do so. Finding it was in the juvenile's best interest, the probate court ordered the termination of the respondent's parental rights. This appeal followed.

On appeal, the respondent contends that: (1) the probate court improperly terminated his parental rights because the State failed to prove beyond a reasonable doubt that DCYF made reasonable efforts toward reunification with his son; (2) the probate court erred in its interpretation of RSA 170-C:10 (2002) by impermissibly admitting into evidence a report of an available witness; and (3) pursuant to Part I, Article 15 of the New Hampshire Constitution, he has a right to confront witnesses in a termination of parental rights hearing. We address these arguments in turn.

█ Before a court may order the termination of a parent's rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. *In re Antonio W.*, 147 N.H. 408, 412 (2002). One such ground is the failure to correct conditions leading to a finding of neglect under RSA chapter 169-C. RSA 170-C:5, III. Once the probate court has found such proof, it must then consider whether termination is in the child's best interest. *In re Antonio W.*, 147 N.H. at 412.

To satisfy its burden under RSA 170-C:5, III, the State must make reasonable efforts to rectify the conditions leading to a neglect finding. *In re Jonathan T.*, 148 N.H. 296, 301 (2002). In analyzing these efforts, we have recognized that the State's ability to provide adequate services is constrained by its staff and financial limitations. *Id.* Thus, the State must "put forth reasonable efforts given its available staff and financial resources to maintain the legal bond between parent and child." *Id.* We will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. *In re Antonio W.*, 147 N.H. at 412.

The respondent contends that after his transfer to the State Prison in 2001, the initial six-month delay in scheduling the court-ordered

psychological evaluation was unreasonable. We disagree. Within a few months of his transfer to the State Prison, the respondent was evaluated and recommended for the sexual offender program. Only because he denied committing the second offense was his participation in the program delayed two additional months so that a polygraph could be administered as required for the program. When the polygraph was offered to the respondent, he refused to take it.

Additionally, the State could legitimately deny him admission into the less intense program because his history of offending required him to submit to more intensive treatment than the shorter treatment program offered. Reasonable efforts were made to enable the respondent to participate in the appropriate program. Because the delays complained of were at least in part attributable to the respondent, we do not find them unreasonable.

■ Moreover, even if the initial delay were unreasonable, the State provided the respondent with numerous opportunities to schedule future evaluations and treatment programs. In August 2001 and October 2001, respectively, the respondent received psychological and psychosexual evaluations, which recommended offense-specific treatment for his sexual behavior. In April 2002, the court specifically ordered the respondent to "participate meaningfully and complete a sexual offender's treatment program." However, his refusal to take a polygraph prevented him from participating in the required sexual offender program. Instead, he arranged to participate in a treatment program in the community upon his release. While his efforts to secure post-release treatment are commendable, his refusal to participate in the intense sexual offender program while in prison constituted a failure to comply with the recommendations of his psychological and psychosexual evaluations, and thus a failure to comply with his consent decree. Therefore, the record supports the probate court's finding that the respondent failed to address his sexual offender issues. In failing to comply with his consent decree, he failed to correct conditions leading to a finding of neglect.

■ In the alternative, the respondent contends that even if the evidence supports a finding of failure to correct, terminating his parental rights is not in the best interest of the juvenile. We disagree. When determining the best interests of the child, we have previously considered the nature of the parent's conduct in correcting conditions leading to a finding of neglect. See In re Jonathan T., 148 N.H. at 303-04; In re Tricia H., 126 N.H. 418, 422-23 (1985). Where the parents refused to cooperate with the service providers and follow through with their recommendations and

instructions, we have upheld termination of parental rights as in the best interest of the child. *See In re Jonathan T.*, 148 N.H. at 303-04; *In re Tricia H.*, 126 N.H. at 422-23. The record is replete with evidence demonstrating that the respondent's unwillingness to comply with the terms of his consent decree, including the requirement that he complete a sexual offender program, was a major barrier to reunification with his son. We agree with the district and probate courts' finding that waiting until the respondent completed post-incarceration treatment (at which time, the juvenile would turn four or five) is not in the juvenile's best interest. Because the respondent has not demonstrated that the probate court's order was unsupported by the evidence or plainly erroneous as a matter of law, we will not overrule it. *In re Antonio W.*, 147 N.H. at 412.

Next, the respondent contends that the probate court erred by admitting into evidence the report of DCYF caseworker Roberta Bell, whom he contends was available within the meaning of RSA 170-C:10. While the respondent concedes that the court properly determined that Bell was living out of state at the time of the hearing, he argues the court failed to address his argument that she was "otherwise reasonably available." The respondent contends that Bell's attendance at the pretrial conference necessarily made her "reasonably available" for the hearing because the State could have subpoenaed her at that time. We disagree.

The admissibility of evidence is committed to the sound discretion of the trial judge, and such a ruling will not be disturbed on appeal unless there has been an unsustainable exercise of discretion. *In re Antonio W.*, 147 N.H. at 414. RSA 170-C:10 provides, in relevant part: "When information contained in a report, study or examination is admitted in evidence, the person making such a report, study or examination shall be subject to both direct and cross-examination if he is residing or working within the state, or if he is otherwise reasonably available."

█ Here, the State presented evidence that Bell terminated her employment with DCYF, sold her home, and moved out of New Hampshire, possibly to New York. Moreover, the record reflects that all parties were made aware at the pretrial conference that Bell would be unavailable for the late February trial date. Thus, the respondent had the opportunity to seek alternative means of obtaining Bell's presence, including issuing a subpoena of his own. Based upon these facts, the probate court properly found that Bell was not residing or working within the State nor reasonably available at the time of the hearing. *Cf. In re Antonio W.*, 147 N.H. at 413; *In re Jonathan T.*, 148 N.H. at 299-300. We

conclude that it was a sustainable exercise of discretion to admit Bell's report.

Finally, the respondent contends that we should apply the Confrontation Clause of Part I, Article 15 of the New Hampshire Constitution to proceedings to terminate parental rights. He concedes that because an action to terminate parental rights is civil, the Sixth Amendment confers no right of confrontation. *See* U.S. CONST. amend. VI; *In re Noah W.*, 148 N.H. 632, 638 (2002). He contends, however, that because our State Constitution provides more protection of individual rights, we should apply the Confrontation Clause of Part I, Article 15 to proceedings to terminate parental rights. Further, he argues that the absence of witnesses who co-authored reports that were admitted into evidence violated his State constitutional right to confront witnesses against him. We have never decided whether the Confrontation Clause of Part I, Article 15 applies to proceedings to terminate parental rights. We hold that it does not.

Under the State Constitution, "[e]very subject shall have a right . . . to meet the witnesses against him face to face." N.H. CONST. pt. I, art. 15. We have recognized that parental rights are natural, essential and inherent rights within the meaning of our State Constitution. *In re Noah W.*, 148 N.H. at 636. "Given the severity of the termination sanction, and the significance of the parental interest, we have held that to terminate parental rights, due process requires proof beyond a reasonable doubt." *Id.* at 636 (quotation omitted).

RSA chapter 170-C provides the defendant with substantial protections. First, he is given notice of his hearing. *See* RSA 170-C:7 (2002). The defendant has the opportunity to conduct direct and cross-examination of a person who prepared reports or conducted studies or examinations of the defendant if the information contained in them is admitted into evidence, and if the person is residing or working in the State, or is otherwise reasonably available. *See* RSA 170-C:10. The court may also require the presence of necessary witnesses. *See id.* Finally, the defendant shall receive notice of his right to counsel, "and if counsel is requested and the parent is financially unable to employ counsel, counsel shall be provided by the court." *Id.*

A termination of parental rights proceeding, however, does not require the full panoply of constitutional rights that are afforded to a criminal defendant. *See In re Adoption of Don*, 755 N.E.2d 721, 729 (Mass. 2001); *In re Baby K.*, 143 N.H. 201, 204 (1998). For example, in *In re Baby K.*, we concluded that "due process does not absolutely require an incarcerated parent's physical presence at a parental rights termination hearing,

provided the parent is otherwise afforded procedural due process at the hearing." *In re Baby K.*, 143 N.H. at 204.

The Confrontation Clause of our State Constitution is identical to the language contained in Part I, Article 12 of the Massachusetts Constitution. On prior occasions, we have given weight to the Massachusetts Supreme Judicial Court's interpretation of Part I, Article 12 of the Massachusetts Constitution. *See State v. Roache*, 148 N.H. 45, 49 (2002). Because the language of the Confrontation Clause is identical, and given the shared history of our state constitutions, we again give weight to the Massachusetts Court's interpretation of an identical provision. *See id.*

In *In re Adoption of Don*, the Massachusetts Supreme Judicial Court determined that it would not apply the Confrontation Clause to a proceeding to terminate parental rights. *In re Adoption of Don*, 755 N.E.2d at 728-29. The court noted the protections afforded parents in child custody and parental termination rights proceedings, and reiterated its rejection of incorporating all the constitutional rights afforded to a criminal defendant. *Id.* at 729. The court concluded "that the unique characteristics of a termination of parental rights proceeding [do not] require incorporating the art. 12 right of face-to-face confrontation guaranteed to defendants in criminal cases." *Id.* at 729. We agree.

RSA chapter 170-C provides parents in a termination of parental rights proceeding with numerous procedural protections. We are not persuaded, however, that the distinctive nature of a termination of parental rights proceeding requires integrating the protections guaranteed to a criminal defendant under the Confrontation Clause of our constitution. Thus, we decline the invitation to do so.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.