Hillsborough County Probate Court
No. 2006-674

## In re Juvenile 2006-674

Argued: March 22, 2007
Opinion Issued: August 17, 2007

*Jordan, Maynard and Parodi, PLLC,* of Nashua (*Steven L. Maynard* on the brief and orally), for the respondent.

*Kelly A. Ayotte,* attorney general (*Jill A. Desrochers,* attorney, on the memorandum of law and orally), for the State.

HICKS, J. The respondent, father of the juvenile, appeals an order of the Hillsborough County Probate Court (*Patten,* J.) terminating his parental rights for failure to correct conditions that had led to a prior finding of neglect under RSA chapter 169-C (2002 & Supp. 2006). *See* RSA 170-C:5, III (2002). We affirm.

The following facts were either found by the trial court or appear in the record before us. The juvenile was born on May 20, 1998. On September 9, 1998, the New Hampshire Division for Children, Youth and Families (DCYF) filed a petition for neglect against the juvenile's mother alleging that the juvenile was in imminent danger and "likely to suffer additional serious impairment" due to the mother's "continued abuse of alcohol." As a result, the juvenile was placed with a foster family with whom he has remained since October 13, 1998.

The respondent has been involved in the abuse and neglect proceedings in the district court since their inception. His reported concerns about the mother were recounted in the supporting affidavit to the abuse and neglect petition, and he appeared at the adjudicatory hearing on the petition. For some six years after the finding of neglect against the mother, DCYF, at the court's behest at numerous review hearings, made repeated efforts to foster conditions under which the respondent could assume full custody of the juvenile. For example, the respondent was provided with various forms of assistance, including parent aides and home based services. He was ordered to participate in parenting classes, maintain appropriate housing, remain sober, and continue counseling "to address ... his poor interpersonal skills and his parenting abilities."

The respondent's "poor interpersonal skills" were a primary concern throughout the abuse and neglect proceedings. According to a court-ordered psychological evaluation, the respondent "has an extensive history

of mental illness with an array of diagnoses assigned over the years: Bipolar Disorder, Mixed Personality Disorder with paranoid, histrionic, narcissistic, dependant, and/or borderline traits, Generalized Anxiety Disorder, Depression, and a provisional diagnosis of Schizo-affective Disorder." The Nashua District Court (*Howorth*, J.) noted that a "feature of [the respondent's personality] disorder is a marked inability to avoid hostile and intimidating behavior when confronted with persons and situations which he regards as being non-supportive."

On December 19, 2000, the District Court (*Howorth*, J.) established a "*provisional* permanency plan of reunification" of the juvenile with the respondent. Sometime prior to April 2003, the respondent sought legal and physical custody through a "*Bill F.*" proceeding in the Nashua District Court. *See In re Bill F.*, 145 N.H. 267 (2000); *see also* RSA 169-C:19-e (2002). The District Court (*Leary*, J.) found that the respondent was "not fit to assume full custody of his son at this time."

Nevertheless, reunification of the respondent and the juvenile remained the goal through at least July 16, 2003. The respondent's behavior, however, continued to be problematic. Orders from a post-permanency review hearing before the District Court (*Leary*, J.) noted that "[r]eports from DCYF, CASA [(Court Appointed Special Advocates)], and SNHS [(Southern New Hampshire Services)] document ongoing and repeated incidents of inappropriate and threatening actions by [the respondent]." These actions apparently included "telling a worker at SNHS that 'he [the respondent] could be one of those people you hear about on top of a roof shooting people.'"

On July 9, 2004, the District Court (*Leary*, J.) entered a permanency order finding the respondent "unfit to perform the parental duties required to provide for the financial and emotional support for [the juvenile]." The court opined that "[b]ased on the history of [the respondent's] behavior, and the nature of his diagnosis, it is highly unlikely that this behavior will change in the future." On October 4, 2004, the District Court (*Leary*, J.) ordered that DCYF was no longer required to make reasonable efforts toward reunification between the juvenile and either parent and authorized DCYF to initiate the termination of parental rights.

The probate court terminated the respondent's parental rights on August 3, 2006, finding beyond a reasonable doubt that, "after a finding of child neglect under RSA 169-C, [the respondent] has failed to correct the conditions that [led] to the finding of neglect, within 12 months, indeed, within 6 years, of that finding, despite reasonable efforts under the direction of the district court to rectify the conditions."

On appeal, the respondent argues: (1) that the trial court impermissibly expanded the grounds for terminating parental rights under RSA 170-C:5, III, thereby violating his state and federal due process and equal protection rights; and (2) that there was insufficient evidence to establish, beyond a reasonable doubt, that the respondent had failed to correct conditions of neglect.

 "Before a court may order the termination of a parent's rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt." *In re Juvenile 2003-195*, 150 N.H. 644, 648 (2004). Under the statutory ground alleged in the petition against the respondent, parental rights may be terminated when "[t]he parents, subsequent to a finding of child neglect or abuse under RSA 169-C, have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the district court to rectify the conditions." RSA 170-C:5, III. Once the probate court has found the petitioning party's burden of proof to be satisfied, "it must then consider whether termination is in the child's best interest." *Juvenile 2003-195*, 150 N.H. at 648. "We will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *Id.*

The respondent argues that "the trial court improperly expanded the statutory definitions of RSA 170-C:5 to accommodate a theory of termination of parental rights not authorized by the statute." He contends that the court erroneously accepted the State's theory tying the district court's prior finding, at the *Bill F.* hearing, of the respondent's unfitness "to allegations of a failure to correct conditions of neglect, as creating the basis to terminate" his parental rights. We disagree.

 The petition for termination of the respondent's parental rights alleged that "[p]ursuant to RSA 169-C:19-e, [the respondent] was found by the Nashua District Court ... not fit to assume full custody of [the juvenile]." The petition clearly stated, however, that the ground for termination was failure to correct conditions of neglect pursuant to RSA 170-C:5, III. The probate court also clearly ruled that it did not base the termination of the respondent's parental rights upon the outcome of the *Bill F.* hearing. Rather, the court stated:

> [The respondent's] actions and inactions found by the district court in its orders on the fitness question under RSA 169-C:19-e, ... and the permanency hearing order leading to the termination of parental rights proceedings ... are facts presented as evidence, among other evidence presented, for a determination

that [the respondent] ultimately failed to correct the conditions of neglect that [the juvenile] suffered, and would likely continue to suffer because of those failures.

We agree. The court heard testimony from a number of witnesses over six days of hearing. It recounted numerous prior orders of the district court throughout the six-year history of the abuse and neglect proceedings, as well as the child impact assessment and CASA's guardian ad litem report. We conclude that the trial court did not use the district court's prior finding of unfitness at the *Bill F.* hearing as "the basis to terminate" the respondent's parental rights.

The respondent also argues that the trial court erroneously "expanded the statutory definitions of RSA 170-C:5" by concluding that the neglect suffered by the juvenile was not his mother's alcoholism, but the actual and potential impairment of his well being. He offers, as evidence that the court read the statutory language more broadly "than a literal reading would indicate," the following statement by the trial court: "[I]t is not the [mother's] alcoholism that is the statutory neglect. Rather, it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being that are the conditions of neglect that must be repaired and corrected in the district court process."

RSA 169-C:3, XIX (2002) defines "[n]eglected child" to include a child:

(b) Who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, when it is established that his health has suffered or is very likely to suffer serious impairment . . . .

The trial court accurately interpreted and applied the statute.

The respondent further contends that his parental rights may not be terminated under RSA 170-C:5, III, consistently with due process, where he "had nothing at all to do with the underlying factors that caused his son to be brought within the protective umbrella of RSA 169-C proceedings" and both the district and probate courts expressly found that he neither abused nor neglected his son. The respondent's argument has long been foreclosed by *In re Tricia H.*, 126 N.H. 418 (1985), in which we held that subsection III of RSA 170-C:5

does not provide that a parent must have been the named respondent in an RSA chapter 169-C neglect proceeding before that parent's rights can be terminated. It requires rather that the parent in question have "failed to correct the conditions leading

> to such a finding within 18 [now, 12] months of the finding," despite the district court's efforts to rectify conditions.

*Id.* at 422.

Our decision in *Tricia H.* is dispositive of the respondent's second due process argument. He contends that "[a]t a minimum, due process requires that a statute give fair notice of conduct that will trigger its application," and argues that a parent reading RSA 170-C:5, III would be led to believe that his parental rights could be terminated only by "his participation in, or refusal to help alleviate the dangerous situation that caused his child to be placed in foster custody in the first instance." He asserts that this case is "distinctly different" from prior cases in which we have upheld the termination of a "non-offending" parent's parental rights because "the constitutional basis for applying the statute [in those cases] was a knowing participation by the parent in the underlying neglect and/or a knowing refusal to participate in the correction of the actual, underlying conditions of neglect."

■ As noted above, however, although not the subject of the original neglect petition, the respondent has been a knowing participant in the abuse and neglect proceedings from the beginning. As such, he was under continuing orders to "address his poor interpersonal skills" in therapy. Nevertheless, problems with his behavior were repeatedly noted throughout the six-year history of the abuse and neglect proceedings and he was at times found to be noncompliant with orders on this issue. As noted in the court-ordered psychological evaluation, the respondent "lost the support of" a number of agencies and professionals as a result of his poor interpersonal skills and resulting difficult behavior, including the following providers: NH Parents as Teachers Program of the Parent Information Center; Southern New Hampshire Services (apparently alienating at different times their parent aide program, transportation service, and fuel assistance program); the juvenile's pediatrician; Familystrength; Child and Family Services; and one or more of the juvenile's schools.

We do not see this case as "distinctly different" from *Tricia H.*, in which the father "actually knew of the neglect proceedings, became a party to them upon his release from New Hampshire Hospital, rebuffed the efforts of the welfare division to involve him in ameliorating the conditions of neglect, and refused treatment offered to help him to become a responsible parent." *Tricia H.*, 126 N.H. at 423; *see also In re Juvenile 2003-195*, 150 N.H. 644, 649-50 (2004) ("Where the parents refused to cooperate with the service providers and follow through with their recommendations and instructions, we have upheld termination of parental rights as in the best

interest of the child."). We found that evidence in *Tricia H.* "more than sufficient" to meet the requirements of RSA 170-C:5, III and ruled that it "provide[d] no colorable basis to raise any issue of due process." *Tricia H.*, 126 N.H. at 423. We similarly conclude here.

■ The respondent next argues that the trial court erroneously conflated two separate and distinct grounds for termination of parental rights: failure to correct conditions of neglect under RSA 170-C:5, III and an inability to parent based upon mental illness or mental disorder under RSA 170-C:5, IV (2002). We disagree. The basis for termination of the respondent's parental rights, as stated by the trial court was:

> [the respondent's] failure, over a seven year period, to sufficiently correct ... conditions of neglect, by not becoming consistently able to meet all of [the juvenile's] needs and avoid the risk of harm or impairment of the child's physical, emotional and mental health and well being, while under the direction of the district court process.

To be sure, the respondent's mental illness presumably contributed to his failure to remedy the conditions of neglect, but the statute makes no exceptions for failures attributable to mental illness. *See* RSA 170-C:5, III. To the extent the respondent is attempting to raise an equal protection challenge, he fails to develop the argument in his brief and we therefore need not address it. *See Gulf Ins. Co. v. AMSCO*, 153 N.H. 28, 40 (2005).

Finally, the respondent contends that the evidence is insufficient to support termination of his parental rights. He argues that he "has complied with request[s] to improve parenting skills, to abstain from alcohol, and to have his own mental health needs addressed." Nevertheless, the record amply supports the conclusion that the respondent's parenting abilities remained incurably deficient.

As the district court stated in a permanency order dated July 9, 2004:

> It is unnecessary to again review all of the many situations when [the respondent] has acted inappropriately, to his son's peril. Suffice it to say that due to [the respondent's] behavior, physicians' offices have taken the extraordinary step of prohibiting [the respondent] from coming into the office and have terminated care for his son. Social service agencies that provide[d] care and financial resources for [the respondent] and [the juvenile] have terminated assistance and prohibited him from entering their premises.

Similarly, the district court noted that when it allowed the respondent to choose the school at which to enroll his son and "to make all related arrangements for his education[,] . . . [t]he outcome . . . was disastrous. The situation ended with his son being expelled from school because of his father's behavior and the school requested a restraining order prohibiting [the respondent] from coming back on campus." We also note that in addition to the obvious and immediate detriment to the juvenile of interruption of and lack of continuity in necessary services, the district court found that the respondent's hostile behavior could negatively affect him in that he might model his father's unacceptable behavior.

The court-ordered psychological evaluation also "raise[d] serious concerns" about the respondent's parenting abilities:

> The patterns of parenting observed by others as well as observed during the evaluation are consistent with a parent who lacks the capacity to shape his behavior to meet his child's needs. On numerous occasions, [the respondent's] decisions about [his son] have been driven by his immediate narcissistic needs regardless of their impact on [the juvenile]

After reviewing the evidence, the probate court concluded that the respondent's limitations left the juvenile "in the same conditions of neglect that he was experiencing at the onset of this case in the district court"; namely, without a parent "able to provide him with the care, comfort and control necessary to meet all of his physical, emotional and mental health needs, without causing a grave risk of impairment to his well being." The court therefore found, beyond a reasonable doubt, that the respondent had failed to correct the conditions that led to a finding of neglect under RSA chapter 169-C. We conclude that the evidence supports that determination. Moreover, the evidence in the record of detriment to the juvenile due to shortcomings in the respondent's behavior and parenting abilities supports the conclusion that termination of the respondent's parental rights is in the juvenile's best interest.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, J., concurred; DALIANIS, J., concurred specially.

DALIANIS, J., concurring specially. While I concur in the majority's opinion because under our deferential standard of review the law and the record support it, the proceedings in this case trouble me. The child has been living with his foster family since October 13, 1998. Under the Federal Adoption and Safe Families Act of 1997 (ASFA), he was entitled

to a permanency hearing "no later than 12 months" after that date. 42 U.S.C.A. § 675(5)(c) (Supp. 2007). The record shows, however, that the court did not hold a permanency hearing until December 19, 2000, more than two years later.

Following that hearing, the district court established a *"provisional* permanency plan" for reunifying the father and his son. Although, through the ensuing years, the court found that the father did not comply with this provisional permanency plan for one reason or another, it permitted the effort to reunify the father and son to continue. Specifically, the court found that the father was not in compliance at the May 15, 2001, August 21, 2001, November 13, 2001, January 23, 2002, June 24, 2002 and July 16, 2003 post-permanency review hearings, but still ordered the State to continue efforts to reunify the father and son. The court even entered a new permanency order on July 9, 2004, that found the father "unfit," but, nonetheless, kept the permanency plan for reunification in place. The court did not change the permanency plan until October 2004, nearly four years after the provisional plan to reunite father and son had been approved.

I believe that leaving the father and son in legal uncertainty for four years is indefensible. Children need and deserve permanent living arrangements. This is why the ASFA requires a permanency hearing within twelve months of the child's entry into foster care. *See State, DYFS v. S.A.*, 908 A.2d 244, 250 (N.J. Super. Ct. Ch. Div. 2005). "If the parents do not show that they are able to provide adequate care of their child after that one (1) year time period, the federal government has mandated that the child deserves permanency, either through termination of the parents' rights and subsequent adoption, or through placement in permanent foster care." *Division of Family Services v. L.C.*, No. CS00-04212, 2002 WL 1932501, at *2 (Del. Fam. Ct. Jan. 17, 2002) (unpublished opinion). "The philosophy behind ASFA is that it is unfair for a child to be held in limbo for a period of much longer than one (1) year." *Id.*

In my view, preventing the child, the biological father and the foster parents from having a resolution of this case for approximately four years is also unfair. This is particularly so since the father, as the district court found in January 2002, was an "eager and devoted parent," who "applied himself to learn parenting skills so as to better care for his son." In spite of the father's efforts, it was long since apparent that he would not be able to safely care for his son. He, his son and the foster parents should have been informed of that conclusion long before now. In keeping with the ASFA, I believe that the needs of all concerned would have been better served had the district court changed the permanency plan from reunification either to permanent foster care or termination of parental rights within a

reasonable period of time after it approved the provisional permanency plan.