908 A.2d 244

STATE OF NEW JERSEY, DIVISION OF YOUTH & FAMILY SERVICES, PLAINTIFF, v. S.A. AND A.C., DEFENDANTS.

IN THE MATTER OF M.C., A MINOR.

Superior Court of New Jersey
Chancery Division Family Part
Burlington County

Decided September 28, 2005.

326

*Eric Foley,* Deputy Attorney General, for plaintiff.

*Peter Fiorentino,* for defendant S.A.

*Beatrix Shearer,* for defendant A.C.

*Frank Farrell,* Law Guardian, for minor M.C.

COVIE–LEESE, J.S.C.

This matter comes before the court by way of an action by the New Jersey Division of Youth and Family Services filed pursuant to *N.J.S.A.* 9:6–8.21 *et seq., N.J.S.A.* 30:4C–12 and *R.* 5:12–1 *et seq.* In the context of that action, the court held a "permanency hearing" pursuant to *N.J.S.A.* 30:4C–61.2 and *R.* 5:12–4(h) over four (4) days, specifically, July 8, 2005; August 3, 2005; August 22, 2005 and September 15, 2005. The Division of Youth and Family Services ("DYFS" or "the Division") proposed a permanency plan pursuant to *N.J.S.A.* 30:4C–55(e) for the minor child M.C. The proposed plan called for M.C. to achieve permanency by way of a placement with a maternal great aunt and uncle who live in Maryland. The permanency plan proposed by the Division was supported by the Law Guardian on behalf of M.C. and was also supported by the biological mother, defendant S.A. The permanency plan proposed by the Division was opposed by the defendant father, A.C. For the reasons which follow, the court approves the proposed permanency plan.

## I. *FACTUAL BACKGROUND*

Several of the facts are undisputed. The defendant mother, S.A., was living in New Jersey when she ran away to New York at age fifteen. She met the defendant father A.C. at that time and began a sexual relationship. Both parents acknowledged that even after A.C., then age twenty-four, became aware that S.A. was under the age of legal consent for sexual relations, the sexual

relationship nevertheless continued. She became pregnant in January 2004 at age seventeen. S.A. contends that when she was a few months pregnant, she broke up with A.C. following an argument during which he had struck her. He had hit or struck her approximately ten previous times, both while she was pregnant and prior thereto. A.C. testified that S.A. moved back to New Jersey for alternate reasons, specifically, to collect the proceeds of a lawsuit settlement. She lived at home in New Jersey for the last six months of her pregnancy. While S.A. was pregnant, A.C. provided her with no financial support, no health coverage and did not attend doctor visits with her.

M.C. was born on September 27, 2001. A.C. was present when M.C. was born. After the birth, S.A. continued to reside in New Jersey with M.C. and maternal relatives. A.C. remained living in New York. S.A. testified that A.C. thereafter attended two of M.C.'s doctor visits. He provided no financial support. In January 2002, he provided some supplies for M.C., including a large box of diapers. He saw M.C. approximately one month after that, and a couple of more times after that.

A.C. testified that he moved to Georgia on September 15, 2003, when M.C. was approximately two years old. He acknowledges that he had no visits with M.C. after he moved. He had planned to visit with M.C. in the summer of 2004, but by that time, M.C. had been placed in DYFS' custody by the court. A.C. testified that he currently lives with his paramour or fiancée, C.A., along with his minor brother who he cares for, as well as C.A.'s three children. He said that he supports those three children "as if they were his." A.C. is also the biological father of two daughters who live in New York. He indicated that there is no court order which obligates him to support those two daughters, but that he sends $200 every seven weeks, equating to approximately $14 per child per week.

The parties agreed that at one time A.C. gave S.A. $1600. He indicated this money was for child support. S.A. stated that this was simply to reimburse S.A. for money that was otherwise

rightfully due to her. It as undisputed that A.C. had received this money after he claimed M.C. as a deduction on his income taxes, even though M.C. did not reside with him. A.C. stated that he also supported M.C. by sending $200 every six weeks. S.A. testified that he sent approximately $200 on only two occasions. There was a Western Union receipt, evidencing one such payment for $200. Including the $1600 that was rightfully hers, had she properly filed her tax return, S.A. said that A.C. sent a total of $2000 to her since M.C. was born.

## II. *PROCEDURAL HISTORY*

On February 2, 2004, by order to show cause based upon a verified complaint, the Division was granted care, custody and supervision of M.C. M.C.'s removal from the home of S.A. was due to the fact that the mother had been incarcerated on charges of attempted murder after having struck her mother with a frying pan. S.A. subsequently went on to be sentenced for aggravated assault and has remained incarcerated throughout these proceedings. It appears that the Division was not aware of the existence of the father A.C., as he was not named as a party to the original complaint. Court hearings were subsequently held on February 19, 2004; February 24, 2004, and March 30, 2004. The Division placed M.C. with her maternal great grandmother, where M.C. has remained to the present time.[1]

On June 8, 2004, the court received a letter from A.C. indicating that since M.C. had been placed with her great grandparents, he had not been able to have telephone contact with M.C. He indicated to the court that he told the great grandparents that he is "ready to continue caring for M.C. the way I used to." He requested that court give him "full custody" of M.C. A.C. thereafter participated via telephone in a court hearing held on that same day, June 8, 2004. On that date, S.A. entered into a stipulation of

---

[1] It is understood among the parties that M.C.'s great-grandmother cannot continue to care for M.C., as a result of the great-grandmother's current health issues and status.

abuse and/or neglect, in lieu of a fact finding trial, conferring jurisdiction on the court. A dispositional hearing was held pursuant to *N.J.S.A.* 9:6–8.47. The court ordered that M.C. remain with the maternal great-grandmother pending further order of the court. The court listed the matter for further dispositional review, as well as A.C.'s application for custody, which had been docketed under docket number FD–03–2241–04.

The FD application for custody and dispositional review under the FN litigation were heard on July 8, 2004. The Division indicated that M.C. was in need of continued therapy and that she was receiving play therapy. A.C. was present in court. When questioned by the court about his last contact with the child, A.C. testified that he saw M.C. in August 2003 before he moved to Georgia. He also saw M.C. when he last appeared for court. The court advised A.C. that it had received information indicating that A.C. had been the subject of criminal charges. A.C. asked "where," to which the court responded that it wanted to know if he had criminal charges "anywhere." A.C. indicated that he had been "pulled over in Georgia." The court then inquired whether there were any charges against him in Brooklyn, New York. The court was then provided with some papers indicating that there had indeed been past charges in New York.

The court made inquiry of A.C. regarding several charges including: (1) a 1993 charge on which he was sentenced; (2) a 1996 charge that was dismissed; (3) a 1997 charge and sentence of imprisonment; (4) several 1999 charges, one of which was dismissed; (5) a 1999 charge resulting in a guilty plea and a conditional discharge; (6) a 2000 charge; (7) a July 2001 charge for which he pleaded guilty and received a sentence of imprisonment; and (8) an April 2002 charge for which he pleaded guilty and was fined $200. A.C. indicated that the 1997 charge for which he was imprisoned was for gun possession. As to the remainder, A.C. claimed that he did not recall what any of the charges were for.

The court stated that in light of the information received, including at least two convictions which resulted in imprisonment, the court was not in a position to grant custody to A.C. even if the court were otherwise so inclined. The court denied the FD application for custody without prejudice, stated that A.C. was free to visit with the child, and that he was free to renew his application for custody before the court upon the provision to the court of more information about his "substantial criminal record." The court stated that without that information, it would be in no position to make a custody award in his favor. Under the FN docket number, the Division was granted continued care, custody and supervision of M.C., with her physical custody continuing with the maternal great-grandmother.

On the next court date for dispositional review under the FN docket number, October 12, 2004, A.C. appeared with counsel requesting to be named as a defendant in the FN litigation. The court granted the request, and listed A.C. as a dispositional defendant. Although the original complaint had no allegation of abuse or neglect against A.C., the court ruled that the disposition of the case affected him as a natural parent, and he therefore had a right to be joined as a party. A.C. was ordered to (1) provide information regarding crimes he pleaded guilty to or was found guilty of; (2) cooperate in any criminal background check performed by the Division; (3) specifically provide information about crimes committed by him on 4/5/02 and 11/9/02; (4) provide a valid Social Security Number to the Division; (5) cooperate in an interstate evaluation of him and his residence; and (6) submit himself for a psychological evaluation.

On February 1, 2005, a hearing was held at which A.C. was again present. The court denied a motion for reconsideration filed by A.C. to be named a "full defendant" as opposed to a "dispositional defendant." Much of the same requirements for the provision of information, as previously set forth above, were imposed on A.C. The court also ordered a paternity test and indicated that A.C.'s visitation would terminate if he was determined to not be

M.C.'s father. The court set the matter down for a permanency hearing on April 12, 2005. That date was adjourned to May 9, 2005. At least one of those dates was adjourned at the request of counsel for A.C. Although no reason was offered to the court, counsel for A.C. had advised the Division that A.C. was unable to travel to New Jersey as a result of receiving an "ankle bracelet" from a court in Georgia due to domestic violence charges against him. The Division so informed the court. The long-overdue permanency hearing thereafter commenced on July 8, 2005.

### III. *STATUTORY AUTHORITY FOR THE PERMANENCY HEARING*

■ Counsel for A.C. initially objects to the permanency hearing taking place in advance of any fact finding as to whether any abuse or neglect was committed by defendant father A.C. Counsel relies on *N.J.S.A.* 9:6–8.47(a). That statutory provision, however, merely indicates that dispositional hearings are held after fact findings, by way of stipulation or trial, are completed. There is nothing which precludes a permanency hearing is found within the Adoption and Safe Families Act of 1997 ("AFSA"), which conditions the receipt of federal funds on the state's implementation of a program which reviews state-supervised children receiving foster care. 42 *U.S.C.* §§ 670–679. The program is required to have a procedure to assure that each child will have a permanency hearing "no later than 12 months after the date the child is considered to have entered foster care." 42 *U.S.C.* § 675(5)(c). AFSA only requires that the hearing be held within twelve months; there is no condition precedent that a fact finding first be held. Accordingly, there is nothing in AFSA which supports the argument made by counsel for defendant father A.C.

Moreover, following the enactment of AFSA, the New Jersey Legislature in 1999 amended Title 9 and Title 30, which are applicable to this action. Indeed, Title 30, also known as the Child Placement Review Act, provides that the court shall review the Division's permanency plan and make a determination after con-

sidering various sources of information following a hearing held "no later than 12 months after the child has been in placement." *N.J.S.A.* 30:4C–61.2a(2). Again, there is no condition precedent that a fact finding occur; the only statutory requirement is that the hearing be held within twelve months. *See also R.* 5:12–4(h).

█ More importantly, if this court were to accept defendant A.C.'s position, the court would be circumventing the very purpose for which the requirement of a permanency hearing was imposed. The legislative history of ASFA indicates that ASFA was intended to promote stability and permanence for children by requiring timely decision-making by the court to ensure that children receive permanent living arrangements outside of the foster care system. *New Jersey DYFS v. M.F.,* 357 *N.J.Super.* 515, 525, 815 A.2d 1029 (App.Div.2003) (quoting Strengthening Abuse and Neglect Courts Act, Pub. L. No. 106–314, § 2(3), 114 Stat. 1266 (2000)). New Jersey's state scheme is intended to serve the same purpose, specifically, to ensure that a child's placement meets the safety, health and best interests of the child. *N.J.S.A.* 30:4C–51. Counsel for A.C. suggests that the court ignore the statutory mandates to hold permanency hearing. To ignore the statutory mandate that a permanency hearing be held, however, would also ignore the legislative goal that a child's placement receive judicial review and that a child receive permanent arrangements outside of the foster care system.

█ In this case, it is noted that the permanency hearing was scheduled to commence on April 12, 2005, which was approximately two-and-a-half months after the twelve-month placement date. The deviation from the statutory directive to hold a permanency hearing within twelve months does not preclude nor mandate reversal of the adoption of a permanency plan. *DYFS v. M.F., supra,* 357 *N.J.Super.* at 526, 815 A.2d 1029. "[N]either the state nor federal statute mandates reversal in the event of noncompliance with the time limitations. Instead, ASFA provides for a graduating series of reductions in a state's funding eligibility." *Id.* (citing 42 *U.S.C.* § 672).

Accordingly, the court finds no statutory basis, other legal authority or public policy to support the argument by defendant father A.C. that the permanency hearing may not be held before fact finding as to both biological parents has been completed. Defendant A.C. requests that the court reject the permanency plan proposed by the Division and order the Division to resubmit a plan only after a fact finding for A.C. is held. For the reasons stated, the court declines to adopt this position.

## IV. *STANDARD OF REVIEW*

In reviewing the child's placement, the court is required to determine whether the "placement ensures the safety and health and serves the best interests of the child." *N.J.S.A.* 30:4C–51; *In re E.M.B.*, 348 *N.J.Super.* 31, 52, 791 *A.2d* 256 (App.Div. 2002). Accordingly, " 'the best interests' of the child is the polestar in the implementation of a placement plan." *State in the Interest of L.L.*, 265 *N.J.Super.* 68, 77, 625 *A.2d* 559 (App.Div. 1993); *see also DYFS v. M.F., supra,* 357 *N.J.Super.* at 528, 815 *A.2d* 1029. In this case, the court is required to determine what is in M.C.'s best interest based upon circumstances as they exist at the time of the hearing. *DYFS v. M.F., supra,* 357 *N.J.Super.* at 527, 815 *A.2d* 1029 (citing *In re Baby M.,* 109 *N.J.* 396, 456, 537 *A.2d* 1227 (1988)).

There is a presumption of custody which exists in favor of a natural parent as opposed to placement with relatives. *Watkins v. Nelson,* 163 *N.J.* 235, 246, 748 *A.2d* 558 (2000). That presumption may be rebutted by proof of gross misconduct, abandonment, unfitness or the existence of "exceptional circumstances." *Id.* at 237, 748 *A.2d* 558. Such a standard, however, applies in custody cases. The hearing before the court is not a custody trial. This is a hearing to determine a child's permanent placement pursuant to Title 30. "The phrase 'permanent placement' is not synonymous with the phrase 'termination of parental rights.' " *In re E.M.B., supra,* 348 *N.J.Super.* at 48, 791 *A.2d* 256. Accordingly, as stated above, the best interests standard applies.

*Id.*; *DYFS v. M.F., supra,* 357 *N.J.Super.* at 528, 815 *A.*2d 1029; *State in the Interest of L.L., supra,* 265 *N.J.Super.* at 77, 625 *A.*2d 559; *see also In the Matter of C.R.,* 364 *N.J.Super.* 263, 835 *A.*2d 340 (App.Div.2003), *certif. denied* 179 *N.J.* 369, 845 *A.*2d 1252 (2004). Indeed, the "best interest" standard employed by the court requires that the court not rely on such a presumption, but rather, engage in "the meticulous fact finding required in custody cases." *DYFS v. M.F., supra,* 357 *N.J.Super.* at 528, 815 *A.*2d 1029 (quoting *Beck v. Beck,* 86 *N.J.* 480, 488, 432 *A.*2d 63 (1981); *State in the Interest of L.L., supra,* 265 *N.J.Super.* at 77, 625 *A.*2d 559), Ultimately, the court must determine "whether the Division's proposed placement plan satisfies the legislative goals and objectives of the Act by providing a stable, safe and healthy environment for the child considering all of the circumstances surrounding the placement." *State in the Interest of L.L., supra,* 265 *N.J.Super.* at 79, 625 *A.*2d 559.

## V. *ANALYSIS*

■ Initially, the court notes that no parties have indicated any objection to the particular caretakers proposed by the Division, specifically, the maternal great aunt and uncle who live in Maryland. It was uncontradicted that they have a suitable residence for M.C. to live. It was undisputed that they have developed a relationship with M.C. as a result of coming at least every other week to see M.C. Indeed, there was uncontested testimony that M.C. was excited about moving to live with them. Since the uncle is a federal government employee and the aunt will be a retired naval officer as of this December, there is no dispute that they have sufficient financial resources to care for M.C. The defendant mother testified that she wanted M.C. to live with M.C.'s great aunt and uncle and further testified that they will be very good caretakers for M.C. There was no evidence to the contrary.

Although there was no objection to the maternal great-aunt and -uncle themselves, the plan was opposed by the defendant

father, who took the position that the Division should have submitted a plan for reunification with the defendant father. Accordingly, the court looks to the circumstances under which A.C. would assume guardianship in determining what plan is in M.C.'s best interests.

It was argued to the court that A.C. should not be considered for placement of this child because he has not assumed financial responsibility for this child in the past, nor does he have the financial means to support her presently. A.C. testified that he earns $200 to $300 per week. He expects that amount is sufficient to support himself, his girlfriend C.A., her three children, his teenage brother, M.C., and M.C.'s two half-siblings in New York who do not reside with him. Defendant is also obligated to pay court-imposed fines. Nevertheless, because of his financial condition, he testified that he was unable to afford the travel costs from Georgia to New Jersey to attend court hearings dates or visit M.C. despite her availability to attend visitation if A.C. appeared for same. While this court may indeed suspect the objection to be true, "the financial wherewithal of the competing parties" is not what controls, but rather, the totality of the circumstances of the placement is what controls. *State in the Interest of L.L., supra*, 265 *N.J.Super.* at 79, 625 *A.2d* 559. The court believes that A.C. has not paid child support, and unless there are other incomes available to him, he does not appear to make sufficient money to provide for all of M.C.'s needs in light of his other obligations. The court will consider this, however, as only one factor in determining the plan which is in the best interests of this child.

It was further argued that A.C. should not be considered for the placement of this child due to A.C.'s criminal history, of which he was less than forthcoming, despite the fact that the court had advised him in July 2004 that his application for custody of M.C. could not be considered without the provision of a greater level of information about his criminal history. A.C. has a criminal history in New York, Georgia and Florida that is probative for its length

and its variety of offenses, many of which the court considered to be significant.[2]  The offenses, along with the testimony of the underage sexual relationship with the defendant mother, as well as his receipt of a tax refund under what appeared to be fraudulent circumstances, appear to indicate a lack of compliance or respect for the laws which govern us.  They indicate a negative pattern of behavior which cause the court to have little or no confidence that the defendant father will be, or remain, legally compliant.  It indicates that at best, he will either be a father whose free time is taken up with illegal or inappropriate matters or the repercussions of such actions (i.e., responding to police, attending court appearances and fulfilling terms of sentences), and at worst, he will be a father who is either incarcerated or otherwise engaging in acts which place M.C. at a risk of harm.

More importantly, at some point in or around April or May of 2005, the defendant father was arrested for an act of domestic violence.  He testified that he "head butted" his then-pregnant girlfriend, C.A., and split her lip.  He contended that it was an accident, caused after an argument when she jumped on his back to prevent him from leaving, and he threw his head back and struck her.  The victim stated that defendant repeatedly struck her in the face which split her lip, left a bruise on her left cheek and, puffy marks on her face, and that he further knocked her to the ground and bit her on her right forearm, which left visible teeth marks.  She cited other instances of physical abuse to her which had escalated over the prior sixteen months since she and A.C. had moved to Georgia.  Following his arrest, he was placed on an electronic monitoring device, otherwise known as an "ankle bracelet," as a condition of his bail.  The allegations by the girlfriend of A.C. indicate the same type of physical abuse to which M.C.'s mother attested.  The incident occurred during the pendancy of this litigation, and indeed this permanency hearing

---

[2] As stated, the court advised A.C. on July 8, 2004, that he needed to provide further information regarding his criminal history. In an affidavit dated March 7, 2005, partial information was provided by A.C.

had to be adjourned as a result of his being unable to travel with his ankle bracelet. The court finds A.C.'s ongoing patterns of physical abuse and criminal activities inconsistent with a plan that "ensures the safety and health and serves the best interests of the child."

Lastly, the court looks to whether there will be psychological harm to this child as a result of adopting a plan for her permanent placement. It is undisputed that A.C. and M.C. have never lived together. The record reflects that there were times that A.C. had some visitation, which the court would term sporadic. Indeed, A.C. moved away to Georgia, with no intent or plan to visit M.C. until possibly ten to twelve months later. The record reflects that M.C. knows who her father is, but the record does not reflect a close or ongoing relationship. The record does not reflect any distress on M.C.'s part as a result of not living with her father. It was undisputed that M.C. is close with her maternal relatives, including the proposed caretakers. As such, the court concludes, noting the absence of any professional bonding reports in the record, that there appears to be no psychological harm to M.C. which is indicated as a result of the adoption of a plan which calls for M.C.'s placement with the maternal great-aunt and -uncle. Indeed, it is more likely than not that a change in M.C.'s physical placement to her father would not be in her best interests due to the past lack of contact, due to the fact that they have at no time resided together, and due to her somewhat fragile state which necessitated her receipt of therapy and possible "acting out" following the few visits with A.C.

As stated, there is no intent to terminate the parental rights of either parent. Thus, there is no suggestion that all contact between M.C. and her parents should cease. The plan proposed to the court leaves open the opportunity for continued contact with M.C. This would not be inconsistent with M.C.'s past experiences with A.C. and therefore least likely to cause her harm.

M.C. has the opportunity to achieve a permanent placement in a safe and stable relative home. It is a plan which

"ensures [her] safety and health and serves [her] best interests." M.C. has been in placement for approximately twenty-one months. She is deserving of receiving the permanency that both state and federal statutes intend for her to receive. M.C. has the right to achieve a permanent placement. M.C.'s rights are no less than the parental rights asserted by A.C.:

> A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable environment.

*New Jersey DYFS v.C.S.,* 367 *N.J.Super.* 76, 842 *A.2d* 215 (App. Div.2004), *cert. denied,* 180 *N.J.* 456, 852 *A.2d* 192 (2004). A trial court errs if it focuses solely on the parent's rights and fails to properly weigh and consider the rights of the child independently of the biological parent. *Ibid.* In this case, to elevate A.C.'s parental rights in light of his unstable, criminally-related lifestyle which has not, and does not, allow for financial support, and which has been based on little contact at best, at the expense of M.C.'s right to achieve permanency, would be inappropriate and contrary to the statutory mandates governing the out-of-home placement of minors.

For these reasons, the court adopts the plan of the Division, as supported by the Law Guardian and the biological mother, for M.C. to achieve permanency by way of her placement with her maternal great-aunt and -uncle in Maryland. The court rejects the position of the biological father and finds that it is not in M.C.'s best interests that she achieve permanency by being placed with him.

## VI. *REASONABLE EFFORTS*

█ The court makes a finding that the Division made reasonable efforts to finalize the plan it proposed to the court. The court addresses the argument of the biological father, A.C., that reasonable efforts were not made by the Division because the Division failed to pay for A.C.'s transportation from Georgia to New Jersey for purposes of visitation.

It is undisputed that A.C. voluntarily chose to move to Georgia from his prior home in New York. M.C. has remained in New Jersey since birth. A.C. was undoubtedly aware, prior to the involvement of DYFS, that he would have to make long distance travel arrangements in order to engage in any visitation with M.C. He was likewise aware that such travel would have to be at his expense.

The Division made M.C. available for visitation if A.C. chose to avail himself of visitation. There is no recognized legal right, however, for an out-of-state parent to become eligible for state-subsidized travel in order to visit their own child who comes under the umbrella of child protective services. *Cf. Termination of Parental Rights: A Handbook for Parents, Legal Services of New Jersey* (August 2002)(www.lsnjlaw.org) ("DYFS must continue to provide you with *opportunities* to visit with your child")("[i]f you have no way to get to your visit, *ask* DYFS to provide you with transportation. If DYFS does not agree . . . your lawyer *may* ask the court" . . .) (emphasis added) (noting permissive, and not mandatory, nature of transportation assistance). Moreover, the fact that DYFS may have voluntarily and generously offered this service to defendant in the past does not obligate DYFS to offer such transportation services to A.C. every time he wanted to come from Georgia for a visit with M.C. Indeed, this court would find it a poor precedent to set, specifically, committing limited state resources to providing transportation to parents who voluntarily chose to relocate out of state and who were not otherwise in contact with their children prior to the institution of litigation by DYFS.

The court therefore rejects the position of the defendant father that the Division failed to exercise reasonable efforts in finalizing the plan.

## VII. *CONCLUSION*

For the reasons stated above, the court adopts the permanency plan proposed by the Division, finding it to be in the best interests

of the minor child. The court finds that it is not safe to place the child with the biological parents in the foreseeable future. The court finds that the Division has made reasonable efforts to finalize the permanent plan. The court finds this case to be an exception to the requirement that there be a termination of parental rights followed by adoption, and finds that custody with the maternal great-aunt and -uncle is appropriate. A permanency order is entered on this date.