Melissa BROWN,[1] Respondent Below, Appellant,

v.

DIVISION OF FAMILY SERVICES, Petitioner Below, Appellee.

No. 480, 2010.

Supreme Court of Delaware.

Submitted: Jan. 12, 2011.

Decided: Feb. 14, 2011.

---

1. The Court, *sua sponte*, has assigned pseudonyms to the parties under Supreme Court Rule 7(d).

Julie H. Yeager, Esquire, of Tybout, Redfearn & Pell, Wilmington, Delaware; for Appellant.

Craig R. Fitzgerald, Esquire, Department of Justice, Wilmington, Delaware; for Appellee.

Cory D. Kandestin, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Guardian Ad Litem for the Minor Child.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

Melissa Brown ("Brown"), the respondent-below, appeals from a Family Court order terminating her parental rights to Daniel, her minor child ("Daniel" or "the child"). On appeal, Brown claims that the trial court erroneously concluded that the Department of Services for Children, Youth, and Their Families ("DFS") made reasonable efforts to reunify her and the child, for two reasons. First, she argues that DFS limited its involvement with her case and never modified or created a second case plan to meet her needs after she moved to Connecticut. Second, she contends that DFS failed to subsidize her visitation travel costs from Connecticut to Delaware. We find no merit to these claims, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Daniel Is Placed In DFS's Care

On January 14, 2008, Brown gave birth to her son, Daniel. Two days after Daniel's birth, DFS received a referral, based on a report that Brown was physically neglecting her child. The referral also reported that Brown had tested positive for cocaine and marijuana early in her pregnancy, had behaved erratically at the hospital following her delivery, had few baby supplies, and was living in a home with no electricity or heat. That same day, DFS sent Rachel Mullens, an investigation worker, to visit Brown at the hospital. Initially, Brown was uncooperative and refused to tell Mullens where she and the child would be living after she was discharged from the hospital. Based on Brown's response, the Family Court granted an emergency *ex parte* custody order giving DFS temporary custody of Daniel.[2] DFS then placed Daniel in foster care with Theresa Smith on January 17, 2008.[3]

---

2. Emergency Ex Parte Custody Order (Jan. 17, 2008).

3. Daniel has remained in Smith's care since his January 17, 2008 placement, and Smith desires to adopt him.

Brown eventually furnished Mullens the name and address of Sharon Klein, who was the aunt of the putative father, Matthew Thompson.[4] Brown and Thompson had been living with Klein. With the goal of placing Daniel in the same home as Brown, DFS began investigating whether Klein was a viable placement option, assuming that Klein would agree to sign a safety plan. DFS learned, however, that although Klein was able to provide Brown and Daniel with suitable housing, Klein was receiving disability benefits resulting from a mental health diagnosis. Moreover, Klein refused to sign a release allowing DFS to investigate whether her mental health diagnosis would pose a danger to Daniel. The Family Court was left unable to determine if placing Daniel with Klein would be safe. As a result Daniel remained in foster care with Smith, because neither Brown nor Thompson gave DFS the names of any other relatives.

At an April 4, 2008 Adjudicatory Hearing, the Family Court concluded that DFS would continue to have custody over Daniel, based in part on Klein's refusal to sign the medical release or safety plan. The court also found that Brown's mental health diagnosis of mild adjustment disorder supported a finding of dependency; in addition, Brown had criminal charges pending against her in Connecticut.

## II. DFS's Reunification Efforts While Brown Lived In Delaware

To help reunite Brown with Daniel, DFS offered to assist Brown with her substance abuse and mental health issues, and referred her to SODAT Delaware, Inc., a rehabilitation center ("SODAT"). Between January 17 and January 31, 2008, Mullens drove Brown to both of Brown's SODAT evaluations, and arranged two visits for Brown with Daniel. On January 31, 2008, DFS transferred the case to its treatment division and assigned Christy Diffendall as Brown's case treatment worker. Diffendall prepared a case plan with the goal of reunification, and met with Brown four separate times between February and March 2008 to discuss the plan. Brown, however, was very confrontational and hostile, and refused to sign the plan.

Under that case plan, Brown would have been required to address her pending Connecticut criminal charges; secure a safe and stable housing environment; comply with mental health and substance abuse treatment; complete an anger management program and parenting courses; and secure sufficient income to provide for Daniel. To help Brown comply with the case plan, Diffendall referred Brown to the New Behavioral Network ("NBN") for parenting and reunification services. NBN created a service plan for Brown, which included completing a parenting course and working with a parent aide, applying for appropriate social service programs and community resources, and completing an anger management class. The parent aide was willing to transport Brown to classes,[5] but Brown only attended three of the eight required parenting classes before being discharged in August 2008 for non-attendance. Although Diffendall also referred Brown to anger management classes at Catholic Charities, Brown refused to attend.

DFS also tried to help Brown secure suitable housing and employment. Diffendall contacted several transitional housing programs on Brown's behalf, and furnished Brown a list of housing programs and shelters. The NBN parent aide drove

---

4. Thompson was later excluded as Daniel's father based on paternity testing.

5. The record shows that the parent aide provided Brown with transportation on numerous occasions.

Brown to different apartments and housing authorities, and helped her fill out housing applications. The parent aide also transported Brown to various job training and employment opportunities. The NBN case manager wrote a letter on Brown's behalf, seeking to move her name further up on the subsidized housing waiting list. In addition to the car rides, DFS gave Brown bus tickets to help Brown attend her appointments, her visitation meetings with Daniel, and Daniel's medical appointments. Brown did manage to obtain employment as a janitor at a local school, but that job ended in March 2008 and Brown was unable to secure further employment.

Brown also refused to enroll in SODAT's substance abuse treatment program. Although she met with a SODAT doctor to help with her mental health issues, Brown was not entirely candid with the doctor. Specifically, Brown did not tell the doctor that she had been diagnosed with bipolar disorder for over a decade. The SODAT doctor recommended that she receive individual counseling, and accordingly, DFS provided Brown individual counseling sessions with Dr. Harry Gardner. On April 2, 2008, Brown met with Patricia Evans, SODAT's director of clinical compliance, to discuss SODAT's recommendations for substance abuse treatment and reunification services. During that meeting, Brown told Evans that she could not commit to the treatment program because she was returning to Connecticut to address her pending criminal charges. Evans encouraged Brown to consult with DFS before leaving the state. Although Brown stated that she would contact SODAT after resolving her legal charges in Connecticut, she never contacted SODAT to schedule an appointment.

### III. *Brown Moves To Connecticut*

On June 11, 2008, Brown left Delaware and moved to Connecticut to address the pending Connecticut criminal charges.

Upon arriving in Connecticut, Brown was immediately incarcerated, from June 11 to July 23, 2008. After her release, Brown rented a room in Bridgeport, Connecticut. At an August 8, 2008 Family Court Review Hearing, Brown testified that despite her and NBN's efforts, she was unable to secure any housing in Delaware. Brown also testified that she had better emotional and financial support in Connecticut, and that she was participating in a mental health treatment program at the Greater Bridgeport Community Mental Health ("GBCMH") facility in Bridgeport.

On October 9, 2008, Brown was again incarcerated in Connecticut. She was released on November 10, 2008, but again was incarcerated from November 18, 2008 to December 31, 2008. While in prison, Brown completed a group anger management and substance abuse program. Upon learning these facts, Diffendall contacted the Connecticut prison in an effort to monitor Brown's activities and learn more about the program. Diffendall determined that the Connecticut prison's program did not satisfy Brown's case plan, because that program was not as rigorous as the one recommended by SODAT, which required individual therapy and random drug screens.

Diffendall also inquired of GBCMH whether they could provide Brown a substance abuse program that would satisfy Brown's case plan. GBCMH told Diffendall that Brown would need to initiate the program voluntarily. Although Diffendall sent Brown a letter explaining what was required, and gave Brown a phone number to begin the process with GBCMH, Brown never entered into a substance abuse program in Connecticut.

#### A. *DFS Explores Additional Placement Options*

Before she moved to Connecticut, Brown had maintained regular visitation with

Daniel on a weekly basis. After she left in June 2008, however, Brown only attended two office visits with Daniel, in August 2008 and in November 2008. Her relocation was a major barrier to reunification. Indeed, Brown herself testified that it was unlikely that her Connecticut housing arrangement would be approved by Connecticut's Interstate Compact on Placement of Children ("ICPC") office.[6] Having already ruled out Klein as a placement option, DFS began investigating whether Daniel could be placed with any other of Brown's relatives.[7] Brown identified Susan Knowles, a relative living in Connecticut, as a potential placement option. Diffendall attempted to contact Knowles, but Knowles never responded.[8] Brown later informed DFS that Knowles was no longer a placement option.

DFS also tried to determine whether Brown's mother, who lived in Connecticut and was caring for Brown's oldest son, was a placement option. When Diffendall attempted to contact Brown and her mother to explain the ICPC housing assessment process, both Brown and her mother became hostile and refused to give Diffendall

the needed information. Diffendall followed up with a letter requesting more information, but neither Brown nor her mother responded.

In addition, DFS explored placing Daniel with Vanessa Childs, Brown's friend who lived in Connecticut. Because Childs was not a relative, an ICPC study would not have been approved; therefore, DFS did not further pursue this placement option.

Finally, DFS also searched for Daniel's unknown father.[9] Although Brown mentioned "Kevin Buckley" as a potential father, she had no contact information for him. DFS's attempts to reach Buckley via publication were unsuccessful, and no one claiming to be Daniel's father ever contacted DFS.

## B. *Connecticut Family Services Becomes Involved*

During the winter of 2008, Diffendall attempted to secure temporary housing for Brown in Delaware. In January 2009, Brown gave birth to a daughter, Lisa, who was taken into state custody by the Con-

---

**6.** Because Brown was living out of state, any home assessment that DFS sought would be governed by the ICPC. The ICPC is an agreement among all 50 states, the District of Columbia, and the Virgin Islands, that establishes uniform legal and administrative procedures governing the interstate placement of children and coordinates the transfer of children across state lines for the purposes of adoption, foster care, and medical treatment. *See* Ass'n of Admins. of the Interstate Compact on the Placement for Children, ICPC Frequently Asked Questions, *available at* http://icpc.aphsa.org/Home/faqs.asp (explaining the ICPC child placement process).

**7.** One relative, Tammy McDaniels, petitioned for guardianship of Daniel in April 2008. But when DFS assessed McDaniels' home, it developed concerns, including overcrowding, lack of income, McDaniels' history with DFS

for striking her own son with a belt, and the presence of a 20–year–old brother with pending drug charges residing in the home. The Family Court ultimately denied McDaniels' guardianship petition, because (1) McDaniels never contacted DFS to show that she had addressed these concerns; (2) DFS was unable to reach McDaniels at her telephone number because it had been disconnected, and (3) McDaniels never appeared at the scheduled guardianship hearing despite receiving proper notice.

**8.** Diffendall attempted to call Knowles in September 2008, but Knowles never responded. Knowles also did not respond to a letter sent from DFS.

**9.** Thompson has been excluded as Daniel's father based on paternity tests. *See supra,* note 4.

necticut Family Services ("CFS"). CFS took custody because Brown was living in a rooming house that did not allow children, admitted that she had not been taking her bipolar medication since November 2008, and was agitated while hospitalized.

CFS assigned Brian Morris as Brown's social worker. Morris created a case plan for Brown that resembled her Delaware case plan, except that the Connecticut plan did not identify substance abuse as a problem. At the time, Morris did not suspect that Brown was using any drugs. CFS also provided Brown reunification services through the Reconnecting Families agency. Brown visited a psychologist, Dr. Brian Houst, for individual psychotherapy sessions related to anger management, impulse control, and substance abuse relapse prevention. Because CFS did not suspect that Brown was using drugs, Brown was not subjected to a substance abuse program or random drug screening.

In March 2009, the Delaware Family Court held a permanency hearing regarding Daniel. The court approved the two goals of termination of parental rights and reunification, with termination of parental rights being the primary goal. The Family Court found that housing, substance abuse, and lack of a parent-child relationship remained major issues. One month later, DFS assigned Lauren Wilson, an adoption worker, to Daniel's case. Diffendall also remained involved, and continued to monitor Brown's compliance with her Connecticut case plan though Morris, other CFS supervisors and lawyers, Brown's doctors, and Reconnecting Families.

In May 2009, DFS requested that CFS conduct an ICPC review of Brown's new residence. After conducting that assess-

ment, CFS denied the placement request, finding Brown's Connecticut home unsuitable. Over the next few months, Brown made progress with her Connecticut case plan and obtained subsidized housing for $67 per month. She also received approximately $1,400 a month in disability benefits. In August 2009, Brown regained custody of Lisa. After learning that, DFS initiated a second ICPC review. That request was approved in November 2009, because Brown had regained custody of Lisa and was complying with her mental health treatment. At a subsequent teleconference on December 14, 2009, the Delaware Family Court ordered an extended holiday visit for Brown and Daniel, and scheduled the termination of parental rights hearing for January 10, 2010. DFS paid for the holiday visit, which occurred from December 28 through December 31, 2009. By the end of that year, Brown had visited Daniel only four times in 2009— three office visits and the holiday visit.[10]

On December 22, 2009, Brown moved to stay the termination of parental rights hearing, arguing that: (a) she had substantially complied with her case plan, (b) she had no pending criminal charges, and (c) the Connecticut authorities had approved an ICPC placement with her in Connecticut. But, by early January 2010, Brown was again using drugs (PCP and marijuana), and was no longer taking her mental health treatment medications. On January 11, Brown was involuntarily committed to St. Vincent's Behavioral Health Hospital, and CFS placed Lisa with a foster home. As a result of Brown's commitment to the psychiatric facility, the Delaware Family Court rescheduled the termination

**10.** Between June 2008 and December 2009, Brown visited Daniel seven times: June 2, 2008, August 8, 2008, November 13, 2008, April 14, 2009, August 4, 2009, September 30, 2009, and the December 2009 holiday visit. Brown cancelled two other visits in March 2009 and May 2009.

of parental rights hearing to March 31, 2010.

After a thirteen-day stay, Brown was released from St. Vincent's. Upon her release, CFS modified her case plan to require more intensive substance abuse and mental health treatment. According to Morris, Brown was to meet with him and her mental health providers in March 2010 to discuss the modified case plan, but that meeting never occurred because Brown refused to cooperate and walked out. Brown also had inconsistent and sporadic visits with Lisa following her stay at St. Vincent's. Brown chose to cancel or cut short most of the scheduled visits.

## C. Termination Of Parental Rights To Daniel

On March 31, April 1, and April 6, 2010, the Delaware Family Court held the termination of parental rights hearing. Several witnesses testified, including: Brown, Diffendall, Wilson (DFS adoption worker), Brown's NBN parent-aide coordinator, Evans (from SODAT), representatives from GBCMH who had worked with Brown, Dr. Houst, and Morris (from CFS). The Family Court concluded that the statutory basis for terminating Brown's parental rights under 13 Del. C. § 1103(a)(5) had been established because: (1) Daniel had been in DFS's custody for over one year, and (2) despite her best efforts, Brown had failed to adequately plan for Daniel's physical needs, emotional health, or development. The bases for that latter conclusion were Brown's long-standing mental health and

substance abuse issues, her noncompliance with treatment programs, her limited contact with Daniel due to her outstanding legal issues in Connecticut, and her inability to secure housing.[11] The Family Court also determined that even though DFS had used reasonable efforts to reunify Brown and Daniel, Brown had failed to comply with the reunification case plan in either Delaware or Connecticut.[12] Finally, after weighing the eight factors prescribed by 13 Del. C. § 722(a), the court concluded that terminating Brown's parental rights was in Daniel's best interests.[13] The Family Court entered a separate order and opinion terminating Brown's parental rights in Daniel,[14] from which this appeal was taken.

## ANALYSIS

Brown's sole claim on appeal is that the Family Court erred by concluding that DFS exercised reasonable efforts towards reunification. Brown advances two arguments: first, that DFS made only minimal efforts to reunify her and Daniel after she moved to Connecticut, and never modified her case plan to meet her needs; and second, that DFS failed to subsidize her travel costs from Connecticut to Delaware via Amtrak to visit Daniel.

 A Family Court's determination to terminate an individual's parental rights is a mixed question of fact and law.[15] To the extent the issues on appeal implicate rulings of law, we review de novo.[16] To the extent the appeal is from a factual finding, this Court will not disturb that

---

11. *Brown v. Div. of Fam. Servs.*, File Nos. CN08–01208, 09–06–09TN, slip op. at 8–14 (Del.Fam.Ct. Aug. 5, 2010) ("Aug. 5th Op.").

12. *Id.* at 11–12.

13. *Id.* at 12–14 (weighing the eight factors listed in 13 Del. C. § 722(a)).

14. July 12, 2010 Order (Del.Fam.Ct.); Aug. 5th Op.

15. *Wilson v. Div. of Fam. Servs.*, 988 A.2d 435, 439–40 (Del.2010).

16. *Reed v. Dillard (In re Interest of Stevens)*, 652 A.2d 18, 23 (Del.1995).

finding unless it is clearly erroneous and justice requires that it be overturned.[17] So long as the trial court's factual findings are sufficiently supported by the record and are the product of an orderly and logical reasoning process, "in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions." [18]

Before terminating an individual's parental rights, the Family Court must make two separate determinations. First, the court must find, by clear and convincing evidence, that one of the statutory grounds for termination under 13 *Del. C.* § 1103 is satisfied.[19] Second, the court must next determine that severing the parental rights is in the best interests of the child.[20] If the termination of parental rights is based primarily on the parent's failure to plan for the child's needs, DFS must prove by clear and convincing evidence that it "made *bona fide* reasonable efforts to reunite the family." [21] The reasonableness of DFS's reunification efforts must be "determined from the particular facts of each case...." [22]

### I. Brown's Claim That DFS Failed To Remain Involved

Brown's first claim lacks merit, because the record supports the Family Court's determination that DFS made reasonable efforts to reunify her and Daniel both before and after she moved to Con-

necticut. In reaching that determination, the Family Court considered several factors: (a) the dangers to the child and the family problems creating those dangers; (b) DFS's selection of relevant services; (c) the DFS case worker's diligence in arranging services for the family; (d) the appropriateness of reunification services made available and accessible to the family on a timely basis, and (e) the results of the intervention.[23] The Family Court found that Daniel was placed in foster care because of Brown's history of mental health problems and her lack of appropriate housing for a child.[24] The court also determined that DFS had provided appropriate services by referring Brown to substance abuse and mental health treatment at SODAT, providing Brown parent-education training through the NBN parent-aide network, and assisting Brown in her efforts to secure employment, housing, and visitation.[25]

Despite all of DFS's efforts, Brown failed to comply with her case plan. Brown does not dispute that, but argues that once she moved to Connecticut, DFS made only minimal efforts to help her meet her Delaware case plan goals for reunification. It is inescapable that after Brown moved to Connecticut, DFS would not be able to assist her as well as it could have when she lived in Delaware. The record shows, however, that Brown received similar support services from CFS,

17. *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).

18. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

19. *Div. of Fam. Servs. v. Hutton*, 765 A.2d 1267, 1271 (Del.2001).

20. *Id.*

21. *Stewart v. Dept. of Servs. For Children, Youth & Their Fam.*, 991 A.2d 750, 758 (Del.

2010); *see also In re Hanks*, 553 A.2d 1171, 1179 (Del.1989).

22. *Stewart*, 991 A.2d at 759.

23. Aug. 5th Op. at 11 (internal citation omitted).

24. *Id.*

25. *Id.* at 11–12.

which provided her with mental health treatment through GBCMH, counseling sessions with Dr. Houst, and reunification services through Reconnecting Families.

Building on the services independently provided by CFS, DFS actively monitored Brown's progress with her Connecticut case plan. Although Brown's Connecticut case plan did not include substance abuse treatment, if an opportunity arose for Brown to receive substance abuse treatment in Connecticut, Diffendall (Brown's DFS case worker) would (and did) contact Brown and provide her instructions for enrollment. Despite Diffendall's efforts, Brown never entered into a substance abuse program and never satisfied that component of her Delaware case plan.

Despite her Connecticut residence, DFS continued to assist Brown to find housing in Delaware. During the winter of 2008, Diffendall inquired of several temporary housing agencies whether they could provide temporary housing for Brown in Delaware. After Brown gave birth to Lisa in January 2009, Diffendall investigated whether Brown's Connecticut home would be suitable for Daniel. DFS also explored (without success) whether Daniel could be placed with various relatives in Delaware or Connecticut. After Brown regained custody of Lisa, Connecticut granted DFS's ICPC home review request in November 2009. But, less than two months later Brown again lost custody of Lisa, after being involuntarily admitted to St. Vincent's.

Although Brown claims that DFS should have modified her Delaware case plan, she identifies no specific requirements that DFS should have changed or modified. Nor does Brown confront the fact that she refused to sign her original case plan.

Brown's Connecticut case plan was substantially similar to her (unsigned) Delaware plan, except that her Delaware case plan also required substance abuse treatment. Even though CFS did not suspect that Brown was abusing drugs at the time she gave birth to Lisa, the record shows that substance abuse remained a problem for Brown, as her January 2010 relapse demonstrated.

The Family Court approved the change in case plan goal from reunification to termination of parental rights only after Brown's repeated incarcerations in Connecticut and after her failure to comply with her mental health treatment program resulted in her losing custody of Lisa. The Family Court identified housing, substance abuse, and lack of a parent-child relationship as the major barriers to reunification. Despite this change in case plan, DFS continued to support Brown by monitoring her compliance with treatment and services in Connecticut and by following up with ICPC requests to determine if her Connecticut residence would be suitable for a child.

For these reasons, Brown's first claim of error lacks merit.

## II. Brown's Claim That DFS Was Obligated To Pay For Travel

■ Brown's second claim—that DFS was required to pay for her travel costs from Connecticut to Delaware—also fails. Brown argues that the only barrier to her reunification with Daniel was lack of a parent-child relationship, and that because she lacked the financial resources to visit more frequently, DFS was obligated to assist her. She relies on *In the Matter of S N F*[26] and *Arthur–Lawrence v. Division of Family Services*[27] to support her claim

26. 1998 WL 665586 (Del.Fam.Ct. Apr. 9, 1998).

27. 884 A.2d 511 (Table), 2005 WL 2397523 (Del.2005).

that for DFS to make "reasonable efforts," it is obligated to pay for an out-of-state parent's visitation travel costs. As discussed below, neither case requires DFS to subsidize an out-of-state parent's travel costs *as a matter of law.*

### A. *In re S.N.F.*

In *S N F*, the natural mother voluntarily left her children and moved to Texas after becoming romantically involved with someone else while undergoing substance abuse treatment. The Family Court found that DFS had failed to use even minimal efforts towards reunification where DFS's only efforts consisted of telling the mother to return from Texas to Delaware, and initiating an ICPC request that was never completed.[28] Commenting on these minimal efforts, Family Court observed that "DFS did not offer the mother financial support and did not offer the mother any means of transportation to travel to Delaware to visit with [her child]." [29] Nor did DFS draft a case plan or offer the mother reunification services, even though the mother had been in rehabilitation treatment and was sober.[30] The Court Appointed Special Advocate ("CASA") recommended that parental rights not be terminated, and that it was in the best interests of the child to be returned to her mother, because mother's circumstances had changed and she had successfully rehabilitated herself.[31] Finding that DFS had made minimal reunification efforts, because DFS believed that the child should be put up for adoption, the *S N F* court concluded that DFS had failed to use reasonable efforts to reunify mother and child.[32]

This case, however, is materially distinguishable. Here, unlike *S N F*, DFS did much more than simply tell Brown to return from Connecticut or initiate a never-completed ICPC request. DFS was actively involved in Brown's reunification services while she lived in Delaware. Even after Brown relocated to Connecticut, DFS worked with CFS to monitor her progress and help her obtain the necessary mental health and substance abuse treatment. DFS also made several attempts to place Daniel with Brown's relatives in Connecticut, and continued to arrange visits between Brown and Daniel whenever Brown came to Delaware. But, because Brown never entered into a substance abuse treatment program as her Delaware case plan required, that ultimately played a role in her losing custody of her other child, Lisa, in January 2010. Moreover, DFS paid the travel expenses for Daniel to visit Brown in Connecticut during the 2009 holiday visit, and also coordinated visits whenever Brown was in Delaware. Finally, unlike in *S N F*, Daniel's *guardian ad litem* also took the position that Brown's termination of parental rights was in Daniel's best interest. In these materially different circumstances, the Family Court's conclusion that DFS used reasonable efforts is not erroneous, let alone "clearly erroneous."

### B. *Arthur–Lawrence v. Division of Family Services*

*Arthur–Lawrence* [33] also provides no support for Brown's argument that DFS must, as a matter of law, fund an out-of-state parent's travel costs to Delaware. In

28. *S N F*, 1998 WL 665586, at *2.

29. *Id.*

30. *Id.* at *4.

31. *Id.* at *1.

32. *Id.* at *3.

33. 884 A.2d 511 (Table), 2005 WL 2397523 (Del.2005).

that case, the natural mother moved to New York with her boyfriend, leaving her children behind in Delaware.[34] After her move, DFS worked with various New York agencies and prepared a second case plan to address the mother's lack of stable housing, lack of basic parenting skills, and lack of means to support her children.[35] The second case plan included having the mother obtain food stamps and mental health counseling, and establish stable housing. The mother failed to comply with that second case plan.[36] During the six months that the mother was in New York, DFS paid the bus fare for the mother's monthly visits to Delaware, but the mother visited only three times.[37] After learning that the ICPC request to place her children in New York had been denied, the mother decided to return to Delaware, after which DFS created a third case plan that was substantially similar to the second, but utilized Delaware instead of New York services.[38] Despite these efforts, the mother still failed to comply with the third case plan, missing several parenting and substance abuse treatment sessions, and mental health appointments.[39] Based on those facts, the Family Court terminated her parental rights, and this Court affirmed.[40]

Although in *Arthur–Lawrence* we acknowledged that DFS had paid for the mother's bus fare between New York and Delaware, our decision did not rest on that fact. Rather, the travel funding was viewed as merely one of many services that DFS had provided to reunify the mother and her children. *Arthur–Lawrence* cannot be fairly read as holding that for DFS to have used "reasonable efforts," it is obligated to pay for an out-of-state parent's visitation travel costs.

▆ In short, there is no legal requirement that in order to make reasonable reunification efforts, DFS must *always* pay for that parent's travel costs. As the New Jersey Superior Court stated, "[t]here is no recognized legal right … for an out-of-state parent to become eligible for state-subsidized travel in order to visit [his or her] own child who comes under the umbrella of child protective services."[41] Even if the State had voluntarily and "generously offered" to pay for travel costs in the past, that "does not obligate [the State] to offer such transportation services … every time [an out-of-state parent wishes to] visit."[42] The New Jersey court properly recognized that it would be "poor precedent" to "commit[] limited state resources to providing transportation to parents who voluntarily chose to relocate out of state…."[43]

34. *Id.* at *2.

35. *Id.* at *3.

36. *Id.*

37. *Id.*

38. *Id.* at *4.

39. *Id.*

40. *Id.* at *6.

41. *Div. of Youth & Fam. Servs. v. S.A.*, 388 N.J.Super. 324, 908 A.2d 244, 254 (2005); *cf. In re L.M.*, 177 Cal.App.4th 645, 99 Cal. Rptr.3d 350, 354 (2009) (holding that in the case of delinquent juveniles, while "[a]dequate visitation with a parent is a necessary and integral component of reunification … [t]his is not to say that parents of delinquent children—even those of limited financial means—are entitled to transportation costs during the reunification period as a matter of constitutional right." (internal quotation marks and citations omitted)).

42. *S.A.*, 908 A.2d at 254.

43. *Id.*

That rationale applies with equal force here. After being released from prison in Connecticut, Brown chose to remain in Connecticut rather than return to Delaware. While in Connecticut, Brown was offered similar services through CFS and Reconnecting Families, and DFS attempted to supplement CFS's offerings to help Brown comply with her Delaware case plan. Once Brown decided to remain in Connecticut, DFS made reasonable efforts to place Daniel either with relatives or with Brown in Connecticut. DFS also paid for Daniel to travel to Connecticut to visit Brown. Given these circumstances, the fact that DFS did not pay for Amtrak tickets for Brown to travel to Delaware does not legally detract from, or negate, the effect of the other efforts and services DFS provided. We, therefore, uphold the Family Court's conclusion that DFS used reasonable efforts to reunify Brown and Daniel.

## CONCLUSION

For the above reasons, the judgment of the Family Court is affirmed.